**UNITED STATES of America**

v.

**Wayne WHITTAKER.**

**Crim.A. No. 01–107.**

United States District Court,
E.D. Pennsylvania.

June 12, 2001.

Opinion Denying Reconsideration
July 11, 2001.

364

Mark A. Miller, Assistant United States Attorney, U.S. Attorney's Office, Michael L. Levy, United States Attorney, Robert A. Zauzmer, Assistant United States Attorney, Philadelphia, PA, for the Government.

Samuel C. Stretton, West Chester, PA, for defendant.

*MEMORANDUM*

DALZELL, District Judge.

Because the same United States Attorney's Office regarded him a perpetrator and a victim of the same alleged insurance fraud, defendant Wayne Whittaker has filed a motion to disqualify that office for its alleged ethical breaches. As we have found no other case presenting such extraordinary conduct on the part of the Government, we consider Whittaker's motion at some length.

*Background*

On February 22, 2001, a Grand Jury indicted Whittaker for mail fraud in violation of 18 U.S.C. § 1341, arising out of what was claimed to be an "insurance give-up". Specifically, the Government alleges that Whittaker, who once leased a 1998 Jeep Cherokee from World Omni Financial Corporation of Bridgeton, Missouri, defrauded Colonial Penn Insurance Company, the car's insurer, when he arranged to have his vehicle stolen in order to relieve himself of further payments to World Omni. It is undisputed that on or about June 6, 1999, the Jeep Cherokee was indeed stolen, and that ultimately Colonial Penn sent an insurance check to World Omni through the United States mails. According to the Government, the Jeep Cherokee was delivered to AOK Auto Parts, a chop shop, where it was disassembled.

On January 29, 2001, the same United States Attorney's Office sent Whittaker a three-page, single-spaced letter, which he received, which began with the following sentence:

> Following a four-year investigation, we have identified you as a victim of a federal crime involving the theft of your motor vehicle as part of a massive chop shop ring centered in Philadelphia, Pennsylvania.

Although the United States Attorney's Office at the time knew that Whittaker was represented by Samuel C. Stretton, Esquire, it did not send the letter to Mr. Stretton, nor did it send a copy of the letter to Mr. Stretton.

After Whittaker was charged, he filed what he styled a motion to dismiss the indictment, based upon the Government's "outrageous conduct". He contended that the January 29, 2001 letter not only demonstrated a conflict of interest within the United States Attorney's Office, but also violated his due process rights, citing, *e.g., United States v. Pitt*, 193 F.3d 751 (3d Cir.1999).

After a hearing on May 24, 2001 at which the author of the January 29, 2001 letter testified, Whittaker amended his motion to include one for disqualification in view of the prosecutors' apparent breaches of the Pennsylvania Rules of Professional Conduct.[1] We have now received additional briefing from the parties on the issue. As will be seen, we find that, as a motion to disqualify, it has merit.

*The Parties' Contentions*

In his supplemental submission, Whittaker identifies no less than eight Rules of Professional Conduct which he believes the Government breached when its left hand called him a criminal and its right hand called him a victim of the same scheme. Specifically, Whittaker cites:

- Rule 1.7, which generally bars conflicts of interest (Whittaker contends that as the January 29 letter purported to be helping him at the same time the Government was seeking to prosecute him, this constituted such a conflict);

- Rule 1.9, which bars a lawyer from taking a position adverse to a former client in the same or a related matter;

- Rule 3.8, which outlines the professional responsibilities of a prosecutor, and in particular Rule 3.8(a), which bars a prosecutor from bringing a claim that he knows is "not supported by probable cause";

- Rule 4.1(a), which bars attorneys from making false statements of fact to third persons (Whittaker maintains that the January 29 letter's statement that he

---

1. In his supplemental brief filed after the May 24, 2001 hearing, Whittaker continues to press his contention that the Government's behavior here was sufficiently "outrageous" to warrant dismissal of the Indictment. As we further note in the margin below, we cannot find that the conduct of the United States Attorney's Office here rises (or sinks) to that level of misfeasance, and we decline to dismiss the action.

was a "victim" constitutes a false statement pursuant to this Rule);

- Rule 4.2, which precludes contact with someone the Office knew was "represented by another lawyer";

- Rule 4.4, which bars the collection of evidence by methods that could compromise the rights of a third party (Whittaker asserts that the letter constituted an effort to obtain a statement in violation of this Rule);

- Rule 8.4(c), which bars conduct involving "misrepresentation"; and

- Rule 8.4(d), which bars conduct "prejudicial to the administration of justice".

Additionally, Whittaker cites R.P.C. 3.7(a) which holds that "a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness" (absent exceptions inapplicable here). Whittaker contends that Assistant United States Attorney Robert Reed, the author of the January 29 letter, may be a witness at trial, and that it would be unfair to have one° Assistant United States Attorney as a witness being examined by another Assistant United States Attorney because Reed's credibility would wrongly be bolstered by such an arrangement.

While not disputing that Assistant United States Attorney Reed mailed the January 29 letter to Whittaker at the same time another Assistant United States Attorney was preparing an Indictment against Whittaker for the Grand Jury, the Government nevertheless argues that the mailing of the letter was "inadvertent". It relies for this contention on AUSA Reed's testimony on May 24, 2001. AUSA Reed was visibly bemused as he recounted how the letter came to be sent to Whittaker, and rather seemed to regard the whole episode with the seriousness of a misdirected letter from Publisher's Clearing-

house. This view is perhaps understandable, as AUSA Reed admitted that he not only allowed a paralegal to assemble the list of about 200 victims,[2] but permitted her to copy his signature for each letter. Reed testified that he never reviewed this list of victims, which he believed the FBI had supplied to the unsupervised paralegal. On questioning from us at the May 24 hearing, however, AUSA Reed acknowledged that he had drafted the January 29 letter, authorized his signature, and knew of ongoing investigations of many chop shop-related people. He did not, however, work with AUSA Mark Miller, the prosecutor in Whittaker's case.

It is undisputed that the January 29 letter was never formally retracted.[3] N.T. 54–55. AUSA Reed also admitted, "I knew that you [Mr. Stretton] represented one of the people in the insurance part of the case", N.T. 47, but never checked whom, exactly, Mr. Stretton represented. Reed also acknowledged that Whittaker was "about to be a defendant with the pending Indictment two or three weeks" after sending the January 29 letter. N.T. 53–54.

*Analysis*

Since April of 1999, lawyers "for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Thus, the two Assistant United States Attorneys involved here, Mark Miller and Robert Reed, are as subject to the Pennsylvania Rules of Professional Conduct as any other lawyer licensed to practice in the Commonwealth of Pennsylvania.

Perhaps because § 530B, popularly known as the "McDade Amendment"[4], is so new,

---

2. Reed at one point in his testimony mentioned "200 vehicles ... identified as being stolen or part, turned over as part of insurance jobs", N.T. 28, and "300 of th[o]se things" [*i.e.*, victim letters], N.T. 47. To be conservative, we use the lower number.

3. The Government takes the position that the subsequent conversation between Whittaker's counsel and AUSA Miller—which occurred after Whittaker informed his counsel about the con-

tents of the January 29 letter, and in which AUSA Miller apparently informed defense counsel that the letter was a mistake—constituted an oral retraction of the letter's contents.

4. Named after former Congressman Joseph McDade, whom this United States Attorney's Office unsuccessfully prosecuted in the 1990's before his retirement.

the parties have not cited to us, nor have we readily been able to locate, cases applying state ethical rules to Government prosecutors. Putting aside the newness of the McDade Amendment, however, we also have found no case involving state or federal prosecutors that addresses the left hand-right hand problem presented here. We nevertheless draw here on the body of attorney disqualification decisions developed in civil cases, including our Court of Appeals's teaching in *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157 (3d Cir.1984), *cert. denied* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

At the analytical threshold, we must determine the exact nature of the relationship, if any, contemplated in the January 29, 2001 letter before we consider what consequences that letter had under the Pennsylvania Rules of Professional Conduct. As will be immediately seen, this, too, sends us to what appears to be an unexplored realm.[5]

### A. *Is a Victim a "Client" of the United States Attorney?*

■ In the January 29, 2001 letter, where AUSA Reed informed Whittaker that "we have identified you as a victim of a federal crime", Reed specifically referenced 42 U.S.C. §§ 10606 and 10607. Section 10606(a) imposes upon "employees of the Department of Justice" and other federal law enforcement agencies the duty to use "their best efforts to see that victims of crime are accorded the rights described in subsection (b)" of that statute. Among other things, those subsection (b) crime victims' rights include, "(5) The right to confer with [the] attorney for the Government in the case." Subsection (c) provides that the statute does not create a private right of action against the Government.

In its description of "services" to victims, § 10607(c) lists, in pertinent part, the duty of the "responsible official" to:

(A) inform a victim of the place where the victim may receive emergency medical and social services;

(B) inform a victim of any restitution or other relief to which the victim may be entitled under this or any other law and manner in which such relief may be obtained;

(C) inform a victim of public and private programs that are available to provide counseling, treatment, and other support to the victim; and

(D) assist a victim in contacting the persons who are responsible for providing the services and relief described in subparagraphs (A), (B), and (C).

Again, this statute provides, in subsection (d), that it does not create a private right of action "in favor of any person arising out of the failure of a responsible person to provide information" as the statute requires.

In fulfillment of these statutory duties, AUSA Reed, on the third page of his January 29 letter, directed Whittaker to "contact any of the following people", and then identified by name his secretary, the FBI case agent, and himself; the letter supplied the phone numbers of all three individuals.

It is not obvious what, if any, relationship §§ 10606 and 10607 creates. For example, in giving victims "[t]he right to confer with [the] attorney for the Government in the case", § 10606(b)(5) imposes upon the AUSA the duty to "inform a victim of any restitution or other relief to which the victim may be entitled under this or any other law and [the] manner in which such relief may be obtained", § 10607(c)(1)(B). It is unclear whether the victim, in exercising these rights, or the AUSA in fulfilling them, are covered by the attorney-client privilege. It is also not clear whether the victim's likely and understandable expectation of confidentiality transforms the statutorily mandated relationship into one of attorney and client. What is clear is that Congress, in adopting what it called the Victims' Rights and Restitution Act of 1990, manifested an intention to

---

5. As discussed above, Whittaker has cited nine Pennsylvania Rules of Professional Conduct that he believes are implicated by the United States Attorney's Office's behavior here. In our discussion below, we find it necessary and appropriate only to assess the application of some, but not all, of these allegedly pertinent Rules.

grant significant real world rights to the victims of crime. In order to afford meaning to the victim's "right to confer" with a Government attorney, it involves no great reach to infer that there must be some degree of confidentiality in that right of conference, and therefore something resembling what is usually thought of as a client-attorney relationship or the expectation of one.

On the other hand, in § 10606(c) Congress explicitly refused to "create a cause of action or defense in favor of any person arising out of the failure to accord to a victim the rights enumerated in subsection (b)", and in § 10607(d) denied a cause of action in the cognate language "arising out of the failure of a responsible person to provide information as required by subsection (b) or (c)". It thus would appear that Congress negated anything that could be construed as a malpractice right usually associated with clients and their attorneys.

Though the question is by no means free from doubt, we conclude that §§ 10606 and 10607 do not create a client-attorney relationship or a reasonable expectation of one. As a result, Rules of Professional Conduct 1.7 and 1.9, which concern clients and former clients, do not apply.

### B. *The Government's Admitted Falsehood*

■ Although the never-retracted January 29, 2001 letter at a minimum suggested the Government's equivocation as to whether Whittaker is a criminal or a victim, in its submission to us after the May 24 hearing, signed by no less than the interim United States Attorney himself, the Government has communicated its definitive position: Whittaker is a criminal, and not a victim. Gov't's Opp'n to Def.'s Mot. for Disqualification at 5 n. 1. But in at last stating this conclusion, the Government reveals the January 29 victim letter to be a palpable falsehood, thereby triggering Pennsylvania Rules of Profession-

al Conduct 4.1(a) and 4.3(c). These Rules provide:

**Rule 4.1 Truthfulness in Statements to Others**

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person....

**Rule 4.3 Dealing [with] the Unrepresented Person and Communicating with One of Adverse Interest**

 * * * * * . *

(c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

It is indisputable on this record that, even though AUSA Reed knew some of the target-victims had lawyers, and indeed that Samuel Stretton was one of those lawyers, he wrote the January 29 letter to Whittaker as if he were an unrepresented person. As will be seen in the next section, dealing with RPC 4.2, Reed's constructive knowledge that Whittaker was a represented person implicates additional duties, but the point of this section is to demonstrate that, regarding Whittaker as unrepresented, the United States Attorney's Office violated two Pennsylvania ethical rules.

Of course, the Government is now at pains to heap ashes on the January 29 victim letter. It now calls it a "mistake"[6] or the product of a sloppy paralegal or of overworked FBI agents or of beleaguered AUSAs that really amounts to no more than a misdirected piece of junk mail.

But no fair-minded person could read the letter as junk mail. It looks in every way like an individually typed and manually signed official communication from the United States Department of Justice. Indeed, the reproduction of Reed's signature was so realistic that even he could not on May 24 tell whether it was manual or copied. N.T. 29–30; 32–33.[7] The three-page letter begins

---

**6.** As AUSA Reed put it in his testimony on May 24, "I'm sorry that I have to be sitting here to tell you that it's a mistake, but a mistake it is." N.T. 40. "I mean I guess—I don't see it as a 'big

mistake'. I see it as an error, just sheer...." N.T. 38.

**7.** In his testimony, Reed said, "I was surprised that I had signed so many." N.T. 29. We are

with the words, "Following a four-year investigation ...," suggesting that the letter was the product of a long period of gestation. It then states, "we have identified you as a victim," an unqualified statement of a conclusion, fortified by a preface that says that this conclusion was the culmination of a four-year investigation.

In sum, had there been specific intent to deceive, the letter would have been a sophisticated and doubtless successful fraud. Since there is no evidence of such *scienter*, it is instead both a "false statement of material fact" and one that would lead any reasonable person in Whittaker's position to "misunderstand[ ] the lawyer's [read "United States Attorney's"] role in the matter." Astonishingly, the attorneys involved made no effort, much less "a reasonable" one, "to correct the misunderstanding" with Whittaker until May 31, 2001, and only in the face of this Court's grave concerns articulated at the May 24 hearing.

### C. *Communications With Non–Clients*

Whittaker's circumstances would also appear to implicate Rule of Professional Conduct 4.2, which provides:

**Communications With Person Represented By Counsel**

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

■ Here, there is no dispute that Whittaker was in fact represented by counsel, and

now told that he signed only once.

**8.** *Balter* was decided before the McDade Amendment became law. In holding the Government attorneys to the requirements of Rule 4.2, the panel relied on the District of New Jersey's local rule applying New Jersey Rules of Professional Conduct to attorneys appearing before the District Court, *Balter*, 91 F.3d at 435. The panel noted that the application of the Rule to Government attorneys was a "question of first impression", but, at least for the purposes of its opinion, found that the district court's decision to apply the Rule was "no doubt ... correct," *Balter*, 91 F.3d at 435 & n. 5. The McDade Amendment removes any doubt on this issue.

indeed that the United States Attorney's office was well aware of this fact. Moreover, there can be no doubt that the United States Attorney's Office, in the person of AUSA Reed, in fact communicated with Whittaker regarding the subject of the representation, namely the characterization of the fate of Whittaker's Jeep Cherokee. Nonetheless, this conduct does not fall under Rule 4.2 because, as he had not yet been indicted, Whittaker was not a "party" under the meaning of this Rule.

In *United States v. Balter*, 91 F.3d 427 (3d Cir.1996) [8], a panel of our Court of Appeals considered a claim by a criminal defendant that certain tape-recorded evidence against him should have been suppressed because the tapes were procured in violation of New Jersey Rule of Professional Conduct 4.2, a provision that is "virtually identical" to Pennsylvania RPC 4.2 that we consider here, *Balter*, 91 F.3d at 435 & n. 4.[9] The Government agents in that case had contacted a suspect named Gustavo Gil, and induced him, as the Government's agent, to record many phone and live conversations with his alleged co-conspirators, including Balter, despite that the Government was aware that Balter had already retained counsel. *Balter*, 91 F.3d at 431, 435. Faced with Balter's challenge under Rule 4.2, the panel concluded that because Balter had not yet been indicted, he was not a "party" pursuant to Rule 4.2 since there was no "matter" for him to be a "party" to, *Balter*, 91 F.3d at 436. Moreover, the panel concluded that the pre-indictment investigation was in any event a contact exempted from the Rule as "authorized by law," *Balter*, 91 F.3d at 436.[10]

**9.** Favorable though this case is to the Government's argument, the Government failed to cite it in its brief.

**10.** In reaching these conclusions, the *Balter* panel relied, *inter alia*, on decisions of the New Jersey courts holding that Rule 4.2 did not apply to pre-indictment contacts with a criminal defendant because such defendant was not a "party", and also that Rule 4.2's "authorized by law" exception included the sort of pre-indictment investigations the Government engaged in with respect to Balter. The use of such reasoning might serve to call into question *Balter's* application to a case such as ours involving *Pennsylvania* Rules of Professional Conduct.

While in our case it is less than clear that the false "victim letter" that the United States Attorney's Office sent to Whittaker can be said to have been "authorized by law"—if for no other reason than the letter could readily have been sent to Mr. Stretton to satisfy both the 1990 Victims' Rights Act and the McDade Amendment [11]—there can be no doubt that Whittaker was, at the time he received that letter, not under indictment and therefore was, pursuant to *Balter's* logic, not a "party" to the matter. We consequently conclude that notwithstanding the McDade Amendment, Rule 4.2 technically does not apply to the Government's actions here.

### D. *Prejudice to the Administration of Justice*

■ Whittaker also cites RPC 8.4(d), which states that "[i]t is professional misconduct for a lawyer to: ... (d) engage in conduct that is prejudicial to the administration of justice." As we have observed in the context of a disciplinary proceeding, we are well aware of the American Law Institute's recent caution regarding such generalized language in its newly-adopted *Restatement of the Law Governing Lawyers*. A portion of the extended Comment provides:

> *General provisions of lawyer codes.* Modern lawyer codes contain one or more provisions (sometimes referred to as "catch-all" provisions) stating general grounds for

discipline, such as engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation" (ABA Model Rules of Professional Conduct, Rule 8.4(c) (1983)) or "in conduct that is prejudicial to the administration of justice" (*id.* Rule 8.4(d)). Such provisions are written broadly both to cover a wide array of offensive lawyer conduct and to prevent attempted technical manipulation of a rule stated more narrowly. On the other hand, the breadth of such provisions creates the risk that a charge using only such language would fail to give fair warning of the nature of the charges to a lawyer respondent (see Comment *h*) and that subjective and idiosyncratic considerations could influence a hearing panel or reviewing court in resolving a charge based only on it. ... Tribunals accordingly should be circumspect in avoiding overbroad readings or resorting to standards other than those fairly encompassed within an applicable lawyer code.

> No lawyer conduct that is made permissible or discretionary under an applicable, specific lawyer-code provision constitutes a violation of a more general provision so long as the lawyer complied with the specific rule.

1 *Restatement of The Law Governing Lawyers* § 5 cmt. c at 50 (2000). *See also In the Matter of Robert B. Surrick*, 2001 WL

---

In this regard, we first observe, as noted in the text, that the language of the New Jersey and Pennsylvania provisions (both of which were adapted from the ABA Model Rules of Professional Conduct) is virtually identical. More importantly, the *Balter* opinion itself demonstrates that its application is intended to be broader than its state of origin. In arriving at its holding, the panel noted that its "conclusion is supported by the decisions of many other courts of appeals. Indeed, with the exception of the Second Circuit, every court of appeals that has considered a similar case has held, for substantially the same reasons as those noted above, that rules such as New Jersey Rule 4.2 do not apply to pre-indictment criminal investigations by Government attorneys," *Balter*, 91 F.3d at 436 (citing cases). This easy reference to the decisions of other circuits, which necessarily involved the conduct rules of other jurisdictions, shows that the *Balter* panel considered its holding to be one of general application. We can be confident, then, that this holding would extend to the Pennsylvania's rules, which are so similar (in this regard at least) to

New Jersey's. We thus find our application of *Balter* to the circumstances of this case to be non-problematic.

11. Interestingly, the protections offered by Rule 4.2 were one of the motivations for the McDade Amendment's introduction. At a hearing before the House Judiciary Committee Subcommittee on the Courts and Intellectual Property regarding the "Ethical Standards for Federal Prosecutors Act of 1996"—an immediate predecessor to the legislation passed as the McDade Amendment the following year—Representative McDade testified that the Justice Department was "attempting to circumvent" the requirements of Rule 4.2, which he characterized as the "essential Sixth Amendment right 'to have the assistance of Counsel' ", *Hearing on H.R. 3386, the "Ethical Standards for Federal Prosecutors Act of 1996" Before the House Judiciary Comm., Subcomm. on Courts and Intellectual Prop.*, 1996 WL 520240 (testimony of Rep. Joseph M. McDade) (Sept. 12, 1996).

120078 * 16, n. 14 (E.D.Pa. Feb. 7, 2001) (Report and Recommendation).

Though the Restatement's caution is well taken in the civil law arena, in the criminal context presented here it does not go as far. In criminal cases, courts have a plenary concern for "conduct that is prejudicial to the administration of justice." This concern is made most salient in the "plain error" rule applicable to criminal cases, which provides that an appellate court may correct errors of a lower court even though the defendant had otherwise forfeited appeal of such errors by failing to raise objections in the lower court, *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). Under that rule, an error that affects a defendant's substantial rights warrants reversal where such error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," *United States v. Evans,* 155 F.3d 245, 251 (3d Cir.1998).

That core concern of criminal jurisprudence is fortified in the ethical context of a motion for disqualification by our interest in protecting the integrity of all proceedings and maintaining public confidence in the judicial system. *ILA, Local Union 1332 v. Int'l Longshoremen's Ass'n,* 909 F.Supp. 287, 293 (E.D.Pa.1995) (citing *In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157, 162 (3d Cir. 1984)). As Judge Adams put it so well a quarter century ago,

> Public confidence in the integrity of legal institutions serves as an over-arching consideration beneath which attorneys practice their profession. The semblance of unethical behavior by practitioners may well be as damaging to the public image as improper conduct itself.

*Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 759 (2d Cir.1975) (Adams, J., concurring).

12. In our Memorandum denying Whittaker's motion to suppress, we found as a fact that "Whittaker had no prior contact of any kind with the criminal justice system and was in that respect a complete naïf at the time of" his May 10, 2000 interview with the FBI. *United States v. Whittaker,* No. 01–107, 2001 WL 632916 at *1 (E.D.Pa. June 5, 2001).

Surely "public confidence in the integrity of legal institutions", especially in the lawyers who practice in them, should be at their acme for prosecutors. Against such an ethical and institutional expectation, the cavalier conduct of the United States Attorney's office falls short. Contrary to AUSA Reed's demeanor on May 24, there is nothing amusing about what occurred here. The prosecutors put Whittaker—a citizen innocent of the criminal justice system [12]—on a roller coaster, one day, November 6, 2000, subpoenaing him to go for photographs, fingerprints, and handwriting exemplars, N.T. 51–52, and another day, January 29, 2001, telling him that "a four-year investigation" has "identified you as a victim ... as part of a massive chop shop ring." This is, in short, no laughing matter.

We also know from AUSA Reed's concession, N.T. 46, that Whittaker was not alone in riding this Government-built roller coaster. While these other target-victims are not before us, their existence confirms the seriousness of the fiasco we consider here. In its repeated unprofessional conduct, the Office has here prejudiced the administration of justice and undermined public confidence in a most sensitive part of our legal institutions. The United States Attorney's Office thus transgressed RPC 8.4(d).

*Remedy*

As noted at the outset, Whittaker originally sought dismissal of the Indictment because of the conduct described here. Upon our stating that such relief was unwarranted [13], Whittaker amended his prayer to seek disqualification of the United States Attorney's Office. Although we have found breaches of three Rules of Professional Conduct, we must engage in a balancing before we decide to disqualify.

13. We did so because there is no evidence, for example, of the Government's using the January 29 victim letter to inveigle information or admissions from Whittaker, or of other malign purpose that might have approached outrageousness. These realities also demonstrate that Whittaker's contention is without merit that the Government ran afoul of RPC 4.4 (using "method of obtaining evidence that violate the legal rights of a third person").

■ The use of a balancing test is proper "in determining the appropriateness of the disqualification of an attorney," *In re Corn Derivatives*, 748 F.2d at 162. Factors relevant to our determination here include (i) Whittaker's interest in prosecution by an unconflicted United States Attorney's office, (ii) the Government's interest in retaining the original counsel, (iii) the risk of prejudice to the Government, (iv) our interest in protecting the integrity of the proceedings and maintaining public confidence in the judicial system. *See Local Union 1332*, 909 F.Supp. at 293 (extracting, in the context of a motion to disqualify under Rule 1.7(a), a similar set of factors from *In re Corn Derivatives*, 748 F.2d at 161–62).

■ Here, Wayne Whittaker holds a clear and strong interest in knowing that the decision to continue his prosecution was made after an objective examination of the circumstances and evidence associated with his case, and in knowing that the contrary views evidently held about him by this United States Attorney's Office (at least at one time) have been conclusively reconciled.[14] As to the second factor, we observe that the Government surely has an administrative interest in maintaining this United States Attorney's Office as counsel, since there will be some cost and loss of efficiency, however modest, associated with the assignment of new counsel. This concern is mitigated, however, by the fact that this appears not to be a legally complicated case, and certainly does not involve a large body of evidence.[15] Consequently, we cannot see that any actual prejudice would accrue to the Government by a disqualification of this Office, and the third factor thus militates in favor of disqualification.

As to the final factor, there can be no doubt that our interest in protecting the integrity of the proceedings and maintaining public confidence in the judicial system favors disqualification. As we have found above, in this case the Government, albeit without bad faith or malintent, sent to the target of an investigation a letter that falsely informed him that he was a victim of the same crime in which the Government now contends he was criminally complicit. While this conduct is towards the lower end of the egregiousness spectrum for prosecutorial errors, it is nonetheless exactly the sort of behavior that may bring our system into disrepute with the citizenry if the judiciary condones it. Simply put, when the United States Attorney's Office brings the unlimited power of the federal government to bear against a citizen, it must do so with precision and with an appropriately cautious eye to the rights and interests of the presumed-innocent people it investigates and seeks to indict. With specific reference to this case, we find that the Government's evidently casual attitude towards communications with investigation targets like Wayne Whittaker risks undermining the integrity of subsequent prosecutions where these communications later turn out to have been false.[16] This final factor, then, weighs strongly in favor of disqualification, and in consideration of all the factors together we conclude that disqualification is the appropriate remedy here.

Fortunately, Congress has supplied us with a ready tool to effect this remedy in 28 U.S.C. § 543. This statute empowers the Attorney General to "appoint attorneys to assist United States attorneys when the public interest so requires."

The Attorney General thus shall appoint an attorney from outside the Eastern District of Pennsylvania U.S. Attorney's Office,

---

**14.** As we have stated above, the Government takes the position that such an interest already has been satisfied, as the interim United States Attorney has now personally—as attested by his signature on the pleadings before us—determined that Whittaker is an alleged criminal, and not a victim. However, we find that the defendant, who, as we have described, has been an unwilling rider on an emotional legal roller coaster of the Government's making, has an interest in knowing that the decision to continue his prosecution was made by an individual who is outside this Office and has no stake or institutional interest in the outcome of the decision to prosecute.

**15.** Counsel have represented that the trial should only take two days.

**16.** Or, for that matter, to have been merely "mistaken".

with no connection to that Office,[17] who shall assume responsibility for this prosecution. This appointee will in the first instance determine whether the equivocal record described herein warrants continued prosecution under extant Department of Justice standards.[18] Such review and, if warranted, preparation shall be completed in advance of the September 17, 2001 rescheduled trial.

## ORDER

AND NOW, this 12th day of June, 2001, upon consideration of defendant's motion to dismiss (document no. 19), later amended to include a motion to disqualify, and after a hearing on May 24, 2001 and consideration of the parties' post-hearing submissions, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED IN PART;

2. The United States Attorney's Office for the Eastern District of Pennsylvania is DISQUALIFIED from further participation in this case;

3. The Attorney General is DIRECTED forthwith to appoint an attorney, pursuant to 28 U.S.C. § 543, to represent the Government in this case; and

4. The special attorney appointed shall by August 15, 2001 advise the Court whether he or she intends to continue this prosecution.

## MEMORANDUM

Defendant Whittaker was indicted for mail fraud, in violation of 18 U.S.C. § 1341, on the theory that he participated in the "insurance give up" of his leased 1998 Jeep Cherokee to a vehicle chop shop. By a Memorandum and Order dated June 12, 2001, we granted Whittaker's motion to disqualify the Eastern District of Pennsylvania United States Attorney's Office from further participation in this prosecution as a result of certain ethical

breaches associated with the fact that one Assistant United States Attorney sent Whittaker a letter stating that he was a "victim" of the same chop shop operation that he is here accused of criminally associating with. The Government has now moved for reconsideration of that disqualification Order.

### The Government's Motion

The Government raises four separate arguments in seeking reconsideration of our disqualification Order. First, it argues that, contrary to our findings, the Government's conduct did not violate Pennsylvania Rules of Professional Conduct 4.1, 4.3(c), or 8.4(d). Second, it contends that even to the extent that there was any Rule violation, disqualification is not warranted here, as the actions surrounding the "victim letter" did not create trial prejudice for Whittaker. Third, the Government maintains that the fact that an Assistant United States Attorney may be a witness in this action does not create a ground for disqualification. Finally, the Government contends that, as a fundamental matter, we may not direct which prosecutor presents a case, because to do so would violate the Constitutional scheme of separation of powers.

### Standard for Reconsideration

While the Federal Rules of Criminal Procedure do not contain a rule specifically discussing motions for reconsideration, particularly not from the Government, our Local Rule of Criminal Procedure 1.2 adopts for use in criminal cases Local Rule of Civil Procedure 7.1(g), which states that "[m]otions for reconsideration or reargument shall be served and filed within ten (10) days after the entry of the judgment, order, or decree concerned"; *see also, e.g., Rankin v. Heckler,* 761 F.2d 936, 942 (3d Cir.1985) ("Regardless how it is styled, a motion filed within ten days of entry of judgment questioning the

---

**17.** By appointing a prosecutor with such a background, we avoid the real RPC 3.7(a) problem that would otherwise arise if AUSA Reed is called as a witness regarding the January 29 victim letter. Given the admission in that letter that Whittaker was a victim, such testimony would hardly relate "to an uncontested issue", RPC 3.7(a)(1).

**18.** For example, the appointee should consider whether proof beyond a reasonable doubt exists on this record, bearing in mind the specific intent element of mail fraud, *e.g. United States v. Pflaumer,* 774 F.2d 1224, 1233 (3d Cir.1985). The appointee should also be mindful of the natural desire of former counsel to justify what happened without regard to the preceding sentence.

correctness of a judgment may be treated as a motion ... under Rule 59(e).”). Absent guidance under the criminal rules, we look to the jurisprudence under Fed.R.Civ.P. 59(e) for guidance in considering this motion.

■■■■ The purpose of a motion under Fed.R.Civ.P. 59(e) is to “correct manifest errors of law or fact or to present newly discovered evidence,” *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), though a motion for reconsideration is not to be used as a means to reargue a case or to ask a court to rethink a decision it has made, *e.g. Waye v. First Citizen's Nat. Bank*, 846 F.Supp. 310, 314 (M.D.Pa.1994), *aff'd*, 31 F.3d 1175 (3d Cir.1994) (table); *Glendon Energy Co. v. Borough of Glendon*, 836 F.Supp. 1109, 1122 (E.D.Pa.1993). Indeed, reconsideration of a previous order is an extraordinary remedy to be given sparingly in the interests of finality and conservation of scarce judicial resources, *e.g. Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F.Supp. 522, 524 (E.D.Pa.1992); *see also Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir.1995). Under Rule 59(e), a party

must rely on one of three grounds to alter or amend a judgment: “(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued the earlier order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice”, *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999); *see also, e.g., Nissim v. McNeil Consumer Products Co., Inc.*, 957 F.Supp. 600, 601 (E.D.Pa.1997), *aff'd*, 135 F.3d 765 (3d Cir.1997) (table); *Smith v. City of Chester*, 155 F.R.D. 95, 96–97 (E.D.Pa. 1994).

It seems clear from the content of the Government's motion that it does not purport to bring to our attention any change in the controlling law or any new evidence. Therefore, the question we must here address is whether the Government has identified a “clear error of law or fact” in our Memorandum and Order of June 12, 2001 or has demonstrated that “manifest injustice” would arise from our failure to reconsider.[1] We will consider the Government's arguments in turn.[2]

---

1. We observe that the Government, in seeking reconsideration, failed to discuss the standards for reconsideration or to consider how the arguments it presents fit into this scheme.

We also note that most of the Government's arguments seem exclusively related to the legal or factual correctness of our June 12, 2001 Memorandum and Order, and are not directed at any injustice that may arise from our decision. The Government, however, does raise several points seemingly associated with “manifest injustice”, and we will briefly note them here.

First, the Government contends that our findings will compel the Justice Department's Office of Professional Responsibility to conduct an investigation of AUSA Reed, who the Government represents has compiled an exemplary record in seventeen years of service, and that this presents an injustice under the circumstances of this case. While we can certainly appreciate that investigations such as the Government describes may be unpleasant, we cannot find that this concern presents an injustice sufficient to require reconsideration of our Order. We do state clearly in our Memorandum our findings, *inter alia*, that AUSA Reed's actions were not motivated by bad faith and that the victim letter was not sent to Whittaker with any specific intent to deceive, and we have every confidence that the Department of Justice's investigation will come to a similar conclusion. Also, it would be a bit odd to reach a finding of “manifest injustice” based on what a

court's decision “forced” a party to do, essentially, to itself.

Second, the Government seems to argue, although primarily *sub rosa*, that a disqualification here, on the grounds of a purportedly mis-sent letter, would work an injustice given the power of today's word processing technology, Gov't's Mem. of Law at 8 n. 2, and given the requirements of the Mandatory Victim Restitution Act, Gov't's Mem. of Law at 4 (referring to “hundreds of chop shop victims”). Again, while we appreciate the difficulties the United States Attorney's Office faces here, we cannot find our Order compounds them to the extent that an injustice arises. Indeed, the realities of such technology would seem to us to cut precisely the opposite way, so that the Government—which has resources limited only by Congress's annual appropriation—redoubles its effort to prevent the cavalier conduct that occurred here.

2. We note at the outset our concern that the Government's briefing of its motion for reconsideration is much more extensive than the materials it submitted to us earlier when we were considering Whittaker's motion to disqualify. Following the evidentiary hearing on May 24, 2001 we afforded both parties the opportunity to supplement their briefs on the issue of disqualification, recognizing that our colloquy with counsel at the hearing might have served to sharpen the parties' focus on the disqualification question. The Government's subsequently-filed brief

*Violation of the Pennsylvania Rules of Professional Conduct*

A. *Rule 4.1*

 Pennsylvania Rule of Professional Conduct 4.1 provides in part:

**Rule 4.1 Truthfulness in Statements to Others**

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person. . . .

In our June 12, 2001 Memorandum, we found that the Government's conduct violated Rule 4.1(a), since the Government's subsequent arguments and statements demonstrate that the January 29, 2001 "victim letter" sent to Whittaker by AUSA Robert Reed was "a palpable falsehood", Mem. of June 12, 2001 at 10.

In seeking reconsideration of this finding, the Government argues that AUSA Reed's conduct cannot constitute a violation of Rule 4.1(a) because Reed's conduct was not "knowing". In support, the Government observes that the "Terminology" section of the Pennsylvania Rules of Professional states that " 'Knowingly', 'Known', or 'Knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." The Government goes on to argue that there is no evidence that AUSA Reed specifically knew that he was sending a letter to Whittaker, and that his action was therefore not "knowing". The

Government also points in this regard to our findings that AUSA Reed had no "specific intent to deceive", Mem. of June 12, 2001 at 12, and that the Government did not have "bad faith or malintent", Mem. of June 12, 2001 at 21.[3]

We cannot find that the Government has identified a clear error of law or fact with respect to Rule 4.1(a). We begin by rehearsing some of the evidence. At the May 24, 2001 hearing, AUSA Reed testified that he knew, from his ongoing investigation into chop shops, that twenty percent of all vehicles "chopped" were in fact "insurance give ups", vehicles whose owners turned the vehicles over to the chop shop, N.T. at 23–24. In the process of preparing the "victim letters", which were sent to those individuals whose vehicles had been chopped, AUSA Reed told the paralegal who was working on the victim letter project not to send victim letters to those identified as potential insurance fraud perpetrators, and in furtherance of this showed the paralegal a list of the possible "insurance give up" individuals N.T. at 34–35. After the victim letters were prepared, AUSA Reed did not examine the names on each letter, N.T. at 36.

While it is certainly true that the "Terminology" section of the Pennsylvania Rules contains the definition of "knowing" discussed above, this definition does not clearly place AUSA Reed's conduct outside Rule 4.1(a)'s purview. First, and as the Government concedes, the definition contained in

---

on the issue of disqualification (and the associated question of dismissal) was eight and one half pages in length. In contrast, the Government's brief in support of its motion for reconsideration is thirty-six pages in length.

While the greater volume of the Government's instant brief is perhaps understandable, to a certain extent, with respect to arguments associated with particular Rules of Professional Conduct (whose salience may not have been clear to the Government until it considered our Memorandum), other arguments, particularly those associated with the question of this Court's power to disqualify the United States Attorney's Office, could well have been made earlier. Naturally, to the extent that the Government has withheld arguments from our consideration until after we have decided a motion, we find this practice at a minimum troubling. Of course, the trade-off is that we do not consider the Government's new

arguments on a *tabula rasa;* rather, we must evaluate them in light of the previous Order under the somewhat strict standard for a motion for reconsideration, which, as set forth in the text, requires that the Government demonstrate a clear error of law or fact in our prior decision.

**3.** The Government also cites in support of its argument three cases from other jurisdictions: *Continental Ins. Co. v. Superior Ct.,* 32 Cal. App.4th 94, 37 Cal.Rptr.2d 843, 851 (1995), *In the Matter of Disciplinary Proceedings Against Rajek,* 176 Wis.2d 132, 499 N.W.2d 671, 672–73 (1993), and *In the Matter of the Petition for Disciplinary Action Against Olkon,* 324 N.W.2d 192 (Minn.1982). None of these cases involves factual circumstances remotely related to those we consider here, and also none contains any extended analysis of the concern that the Government addresses. We therefore will not further discuss these cases.

the "Terminology" section notes that "knowledge can be inferred from circumstances". More significantly, the Supreme Court of Pennsylvania, in considering whether an attorney may be properly disciplined for a misrepresentation, has found that "the requirement is met where the misrepresentation is knowingly made, or where it is made with reckless ignorance of the truth or falsity thereof.... [R]ecklessness may be described as the deliberate closing of one's eyes to facts that one had a duty to see or stating as fact, things of which one was ignorant," *Office of Disciplinary Counsel v. Anonymous Attorney A,* 552 Pa. 223, 714 A.2d 402, 407 (1998) (discussing elements of a prima facie violation of Pennsylvania Rule of Professional Conduct 8.4(c)).[4] Applying this standard[5], we observe that on AUSA Reed's own testimony, he was in possession of a list of those people who were suspected of being perpetrators of "insurance give up" schemes. AUSA Reed also testified that he subsequently failed to consult that list prior to transmitting the "victim letters"; indeed, he testified that he never reviewed the names on the letters that were actually sent. On these facts, we cannot conclude that finding a violation of Rule 4.1(a) on the "recklessness" standard discussed above was a clear error of law.[6]

B. *Rule 4.3(c)*

■ Pennsylvania Rule of Professional Conduct 4.3 provides in part:

**Rule 4.3 Dealing [with] the Unrepresented Person and Communicating with one of Adverse Interest**

\* \* \* \* \* \*

(c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

In our June 12, 2001 Memorandum, we found that the false nature of the "victim letter" also constituted a violation of this Rule, Mem. of June 12, 2001 at 10–11.

In seeking reconsideration of this finding, the Government argues that the evidence shows that the Government attorneys did indeed comply with this Rule. In particular, the Government relies on the undisputed fact that when Whittaker's counsel contacted AUSA Miller concerning the victim letter, AUSA Miller advised him to disregard the letter, as it was "a mistake" that had been "inadvertently sent", N.T. at 55–56. While the Government goes on to concede that a formal written retraction might have been the "better practice", it contends that Rule 4.3 is "most often" invoked where a party has attempted to elicit information through a pretense and never clarified the matter.[7] The Government maintains that because it, upon contact from Whittaker's counsel, immediately stated that the letter was an error, its conduct cannot be in violation of Rule 4.3(c).

---

4. Pennsylvania Rule of Professional Conduct 8.4(c) provides that it is "professional misconduct" for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

5. We recognize that the language of Rule 8.4(c) does not track with that of Rule 4.1(a), and in particular 8.4(c) contains no requirement of "knowing" misrepresentation. On the other hand, the Pennsylvania Supreme Court's discussion in *Anonymous Attorney A* was specifically concerned with the level of scienter necessary for the imposition of discipline as the result of a misrepresentation, and we therefore construe its discussion as applying more generally. *See also Office of Disciplinary Counsel v. Surrick,* 561 Pa. 167, 749 A.2d 441, 445 (2000) (holding that standards applicable to Rule violations with a requirement of intention also apply to Rule 8.4(c)). Moreover, we observe that the Pennsyl-

vania Bar Association's Ethics Handbook imports the discussion from *Anonymous Attorney A* into its discussion of Rule 4.1(a), *Pennsylvania Bar Association Ethics Handbook* (Laurel S. Terry et al. eds., rev. ed.2000) § 8.2a. While this *Handbook* is of course not authoritative, we do consider it in determining whether the application of such a standard to Rule 4.1(a) would be a clear error of law.

6. This is not to say that it is not a close case, but as discussed in the margin above, we must consider this motion on the standard for a motion for reconsideration. After *Anonymous Attorney A* and *Surrick,* however, one may query how close this question remains.

7. In support of this contention, the Government cites to a single case from the District of South Dakota.

To the extent that the Government contends that this episode was not in fact an effort to inveigle information from Whittaker, we agree, as we stated in our earlier decision, Mem. of June 12, 2001 at 19 n. 13. However, as we detailed in our earlier Memorandum, we cannot agree that the oral representation to counsel that the victim letter was a mistake amounts to a "reasonable effort to correct the misunderstanding" given the unqualified nature of the statements in the letter. Of course, it bears noting that the Government *initiated* no effort, much less a reasonable one, to correct anything here.

Other than the argument detailed above, the Government offers no authority to demonstrate that the conduct at issue here is not within the purview of Rule 4.3(c). Its arguments therefore do not amount to a showing that our finding was a clear error of law or fact.[8]

### C. *Rule 8.4(d)*

Pennsylvania Rule of Professional Conduct 8.4(d) provides that "[i]t is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice." In our June 12, 2001 Memorandum we found that the Government's behavior here constituted a violation of that Rule, since "its repeated [9] unprofessional conduct" "has here prejudiced the administration of justice and undermined public confidence in a most sensitive part of our legal institutions," Mem. of June 12, 2001 at 18.

The Government raises a series of arguments to support the contention that its behavior did not in fact violate Rule 8.4(d). The Government first argues that the com-

mentary to the Rule demonstrates that the Rule does not address conduct such as that seen here, and it then goes on to discuss a case from the Pennsylvania Supreme Court and one from our Court of Appeals that the Government maintains equally demonstrate the inapplicability of Rule 8.4(d).[10] We consider these authorities.

The commentary to Rule 8.4 states, *inter alia*, that:

Traditionally, the distinction [between illegal conduct reflecting adversely on the fitness to practice law and that which did not so reflect] was drawn in terms of offenses involving "moral turpitude." . . . [A] lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty or breach of trust are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

As an officer of the court, a lawyer should be particularly sensitive to conduct that is prejudicial to the administration of justice. An example of a type of conduct that may prejudice the administration of justice is violation of an applicable order of court.

The Government also cites to *Office of Disciplinary Counsel v. Price*, 557 Pa. 166, 732 A.2d 599, 604 (1999).[11] There, the Pennsylvania Supreme Court considered a disciplinary case involving an attorney who had himself signed Department of Public Welfare forms that were supposed to have been com-

---

8. That is, merely because this Rule does not perhaps typically cover circumstances such as those we consider here, this atypicality does not logically mean that these actions clearly do not in fact fall under the Rule.

9. As we noted in our June 12, 2001 Memorandum, AUSA Reed testified that Whittaker was not the only "insurance give up" investigation target who was sent a victim letter.

10. At the outset, the question of whether reconsideration of our finding with respect to Rule 8.4(d) is in fact warranted may be moot. As we have above found that there is no cause to reconsider our findings with respect to Rules 4.1(a)

and 4.3(c), there is no question that a disqualification analysis is warranted in this case, irrespective of whether Rule 8.4(d) was technically violated.

11. In addition to *Price*, the Government cites to a number of cases from other jurisdictions that it contends demonstrate that Rule 8.4(d) is only invoked for "egregious conduct and/or the knowing presentation of false statements", Gov't Mem. of Law at 17 n. 6. As the Government also makes reference to Pennsylvania and Third Circuit cases, we will consider only those and will not discuss those cases from other states and circuits.

pleted by a physician [12] and who also had filed court documents containing false allegations of wrongdoing against two District Justices and an Assistant District Attorney. In discussing the standard for assessing whether conduct violates Rule 8.4(c) [13], the court adopted the analysis from *Anonymous Attorney A* discussed above:

> When the alleged misconduct is misrepresentation in violation of Rule 8.4(c), a prima facie case is made where the record establishes that the misrepresentation was knowingly made, or made with reckless ignorance of the truth or falsity of the representation. *Office of Disciplinary Counsel v. Anonymous Attorney A,* [552 Pa. 223, 714 A.2d 402, 407 (1998)]. Recklessness may be described as "the deliberate closing of one's eyes to facts that one had a duty to see or stating as fact, things of which one was ignorant." *Id.*

*Price,* 732 A.2d at 604.

The Government also refers us to *United States v. One 1973 Rolls Royce,* 43 F.3d 794 (3d Cir.1994). In that case, a panel of our Court of Appeals was required to interpret, as a matter of first impression, the "willful blindness" language in 18 U.S.C. § 881(a)(4)(C), the drug forfeiture statute. The panel found that:

> In our leading case on willful blindness, *United States v. Caminos,* 770 F.2d 361, 365 (3d Cir.1985), we held that the deliberate ignorance requirement is met only if "the defendant himself was subjectively aware of the high probability of the fact in question, and not merely [if] a reasonable man would have been aware of the probability." *Id.* at 365. Under this definition, willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge. Although

courts and commentators have yet to come to a consensus on a definition of wilful blindness, the *Caminos* formulation basically adopts the mainstream conception of willful blindness as a state of mind of much greater culpability than simple negligence or recklessness, and more akin to knowledge.

*One 1973 Rolls Royce,* 43 F.3d at 807–08 (footnotes omitted). The Government appears to argue that *One 1973 Rolls Royce* demonstrates "the familiar recognition that sanction for misconduct is warranted only where the offense was committed knowingly or with willful blindness," Gov't's Mem. of Law at 18.

We cannot find that the Government's arguments demonstrate any clear error in our finding of a violation of Rule 8.4(d). To begin with, the commentary to Rule 8.4 makes no statement that would foreclose application of Rule 8.4(d) here. While the commentary, as quoted above, points out that not all improper conduct by an attorney should be imputed to his professional fitness, it would not seem that this caveat applies here, where we address actions directly associated with the prosecution of a case. To the extent that the commentary does directly address the "conduct ... prejudicial to the administration of justice" that is the subject of Rule 8.4(d), the commentary merely gives one example of violative conduct, and does not contain any discussion that would show our application to be in clear error.

Moving to the Pennsylvania Supreme Court's decision in *Price,* and as we have discussed above in connection with Rule 4,1(a), we find that AUSA Reed's conduct does not clearly fall outside the "recklessness" standard, given his possession of the

---

**12.** The attorney signed these forms "Dr. Neil Price, J.D.", and argued that this was not inaccurate because he did hold the degree of juris doctor. The court was not convinced by this line of argument, *Price,* 732 A.2d at 606.

**13.** The court discussed the *Anonymous Attorney A* standard in its analysis of whether attorney Price violated Rule 8.4(c). The Disciplinary Board had also found that Price had violated Rule 8.4(d), but the court did not extensively discuss that finding. Instead, the court merely concluded that "[a]dditionally, based on the fore-

going [discussion, where the court found that Price violated Rules 3.3(a)(1), 8.2(b), and 8.4(c)], we concur with the Board's finding of violations of Rule 3.1, which precludes the assertion of frivolous issues, and Rule 8.4(d), concerning misconduct prejudicial to the administration of justice." *Price,* 732 A.2d at 606. It is therefore not clear in the first instance that the standard from *Anonymous Attorney A,* which explicitly addresses Rule 8.4(c), in fact pertains to violations of Rule 8.4(d).

list of investigation targets and his decision not to review the names on the victim letters that were sent out. Similarly, to the extent that its analysis of the standards applicable to 18 U.S.C. § 881(a)(4)(C) are relevant to our inquiry, we cannot find that *One 1973 Rolls Royce* demonstrates that Rule 8.4(d) does not apply here. Further, none of the materials that the Government cites relate to prosecutorial conduct; we find this significant, since our concerns for prejudice to the administration of justice in this case arise from the fact that it was an Assistant United States Attorney who engaged in the behavior.[14]

We now move to consider the Government's arguments that, irrespective of whether a Rule violation occurred, disqualification is not proper here.

*Absence of Trial Prejudice to Whittaker*

The Government first maintains that an ethical violation does not support disqualification "absent prejudice to the opponent or to the integrity of the justice system," Gov't's Mem. of Law at 22. In particular, the Government argues that it is not our function to enforce disciplinary rules, but instead we may only disqualify counsel where the misconduct has affected the matter before the court. In support of this contention, the Government cites *In re Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984), in which the Pennsylvania Supreme Court held that while trial courts could disqualify counsel "in order to protect the rights of litigants to a fair trial", trial courts were not to "use the [Rules of Professional Conduct] to alter substantive law or to punish attorney misconduct," *Pedrick*, 482 A.2d at 221.

We cannot find that this argument demonstrates clear error in our findings. As we stated in our June 12, 2001 Memorandum, our power to disqualify counsel arises not from the Pennsylvania Supreme Court or the Pennsylvania Rules of Professional Conduct[15] but rather from the "inherent powers of any federal court" to supervise "the admission and discipline of attorneys practicing before it," *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984).[16] The Government's reliance on the standards applicable to Pennsylvania state courts is therefore misplaced.[17]

*Effect of Possible Testimony at Trial By a United States Attorney's Office Employee*

The Government next argues that the fact that AUSA Reed may be called to testify at trial does not support disqualification pursu-

---

**14.** The Government also contends that we erred in concluding that the United States Attorney's Office, rather than an individual attorney, violated Rule 8.4(d), Mem. of June 12, 2001 at 18, arguing that the Rules apply to individual attorneys and that we cannot hold an Office vicariously liable for information held separately by different attorneys, Gov't's Mem. of Law at 20. This argument does not require us to reconsider our findings; as discussed above, we find that AUSA Reed's conduct itself falls under Rule 8.4(d). Similarly, the Government argues that there has been no showing of any prejudice to the administration of justice, since "Whittaker was informed of the error as soon as the government was cognizant of it," Gov't's Mem. of Law at 21. As we discussed in our June 12, 2001 Memorandum, we simply do not agree that there was no prejudice to justice here, and the Government's argument regarding notice does not demonstrate clear error in that conclusion.

**15.** Though of course these Rules are applicable to Assistant United States Attorneys pursuant to 28 U.S.C. § 530B.

**16.** Similarly, our Memorandum and Order detailed the factual predicate for the sanction and discussed how alternative sanctions were insuffi-

cient, as required by *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir.1994).

**17.** The Government goes on to argue that the only possible prejudice that could have accrued to Whittaker as a result of the victim letter would have occurred if he had, in response to the letter, made statements to the Government, and that it is undisputed that no such statements were made. The Government further contends that to the extent that Whittaker was, as we found, placed on a "roller coaster" by the Government's conduct, Mem. of June 12, 2001 at 18 & 20 n. 14, his ride was "of exceedingly short duration," and this neither prejudiced Whittaker nor aided the Government, Gov't's Mem. of Law at 25. As discussed above, the Government fails to cite any controlling authority for the principle that a substantial level of actual trial prejudice must exist to warrant disqualification. Leaving that aside, however, the Government continues, in our view, seriously to underestimate the effect of its cavalier conduct and the systemic prejudice that arises thereby.

ant to Rule 3.7, citing, *inter alia,* to *United States v. Aponte,* No. 96–137–1, 1996 WL 612839 at *2–*3 (E.D.Pa. Oct. 25, 1996). The references to Rule 3.7 in our June 12, 2001 were restricted to one in a description of Whittaker's contentions, Mem. of June 12, 2001 at 4, and to a remark that any Rule 3.7 problem was avoided by our·decision to disqualify the United States Attorney's Office, Mem. of June 12, 2001 at 22 n. 17. As our decision to disqualify was not predicated on the Rule 3.7 issue, we cannot see how the Government's argument here serves to demonstrate clear error of law or fact in our holding, and we will therefore move on.

*Separation of Powers*

The Government's last argument in seeking reconsideration is that "except in the most extraordinary circumstances," we "may not disqualify a prosecutor absent actual prejudice to the defendant, lest separation of powers be offended," Gov't's Mem. of Law at 29.[18] The Government contends· that our concerns that an independent review of the case is necessary to ensure that this action should be prosecuted, Mem. of June 12, 2001 at 20, 22, do not permit us to order the disqualification of the United States Attorney's Office. In particular, the Government argues [19] that the United States Attorney is in fact committed to prosecuting this case and that this decision is properly left to the sole discretion of the United States Attorney. The Government cites to several Supreme Court decisions in support of this, including *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985), and *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 807, 107 S.Ct. 2124, 2137, 95 L.Ed.2d 740 (1987), arguing that "so long as the prosecutor has probable cause to believe that the accused committed an offense … the decision … to prosecute and what charge to file or bring before a grand jury, generally rests entirely in his discretion," *Bordenkircher,* 434 U.S. at 364, 98 S.Ct. at 668, that "the decision to prosecute is particularly ill-suited to judicial review," *Wayte,* 470 U.S. at 607, 105 S.Ct. at 1530, and that decisions such as those regarding targeting of investigations and the bringing of charges are "made outside the supervision of the court," *Young,* 481 U.S. at 807, 107 S.Ct. at 2137. The Government further notes that there may be disputes within a United States Attorney's Office regarding a case, but that this process is not subject to judicial review and a court may not second-guess the United States Attorney's final decision.[20]

**18.** We note as an initial matter that the Government's argument here is premised on "the absence of any ethical misconduct by any government lawyer regarding the inadvertent letter," Gov't's Mem. of Law at 29. As the discussions above and in our June 12 Memorandum show, we do not agree that this premise has been met, and that the Government's conduct here did indeed violate several Rules of Professional Conduct.

**19.** The Government also "challenge[s] the notion that the error here would invite public disrepute" on the ground that "no reasonable member of the public could conclude that this office acted to undermine the orderly prosecution of a criminal case," Gov't's Mem. of Law at 30. As the Government does not tie this contention in with its broader argument, and since, as detailed in our June 12, 2001, we arrive at a different conclusion about the possible perception of the Government's actions here, we will not analyze this line of argument further but will instead proceed to the Government's primary contention regarding interference with prosecutorial discretion.

**20.** In this regard, the Government cites to *United States v. Abuhouran,* 161 F.3d 206, 216 (3d Cir. 1998) for the proposition that there are "substantial restrictions on judicial review of nonconstitutional challenges to prosecutorial decision making." While this is doubtless true as a general principle, *Abuhouran's* holding does not compel reconsideration of our prior Order here. In *Abuhouran,* the panel considered whether a district court could *sua sponte* grant a defendant a downward departure at sentencing for substantial assistance to the Government even where the Government itself had not moved for such a departure, *Abuhouran,* 161 F.3d at 207–08. The panel found that this was not permissible, in part because in order to assess the nature and extent of a defendant's cooperation, a court would need to examine the prosecutor's confidential case files and conduct an inquiry into ongoing prosecutorial and investigative decisions, actions which would be inappropriate given the deference extended by courts to prosecutorial decision making, *Abuhouran,* 161 F.3d at 215–16. These concerns are not at all implicated in the circumstances of this case. Our disqualification Order does not require or mandate any court examination of prosecutors' files or any further inquiry into their decisions. Rather, we have found—through the most superficial of inquiries—evi-

These arguments do not demonstrate clear error in our prior holding. Most fundamentally, our disqualification Order, which directs the Government to appoint a special attorney to evaluate and prosecute the case, does not invoke any type of judicial review over the discretionary functions of the prosecutors. Rather, we seek to ensure that this discretion is properly exercised by an attorney unconnected with the breaches that have occurred in this case. This could be accomplished by the Attorney General's appointment of a special prosecutor from a United States Attorney's Office from, say, one of the Districts contiguous with this one—hardly an act of judicial intrusion into the Article II Branch. While it is true that the deliberative process inside the United States Attorney's Office remains generally outside judicial review, in this case we face the unusual situation where an evident difference of opinion within the office [21] has become a matter of the public record, and this circumstance warrants some level of judicial attention and the limited relief we have imposed here.[22]

Finally, the Government argues that through our disqualification order we wrongly take on "the executive's prerogative to prosecute crime as it sees fit," and "upset[s] the common and beneficial practice in which prosecutors who have pursued a broad set of crime continue to pursue all related matters to their conclusion," Gov't's Mem. of Law at 32, and that consequently our Order violates the Constitutional separation of powers. In support of this position, the Government cites a number of federal cases from other Circuits and Districts. It argues that disqualification "is a drastic measure which

courts should hesitate to impose except when absolutely necessary," *Matter of Grand Jury Subpoena of Rochon*, 873 F.2d 170, 176 (7th Cir.1989), and that "[a] federal court that imposes sanctions on executive conduct that is otherwise permitted by the Constitution, a federal statute or a rule will most likely be invading the executive sphere," *Rochon*, 873 F.2d at 174 (quoting *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir.1985)). The Government also cites to several district court cases for the proposition that a showing of actual prejudice is necessary to trigger disqualification, *e.g. United States v. Santiago-Rodriguez*, 993 F.Supp. 31 (D.P.R.1998), *Bullock v. Carver*, 910 F.Supp. 551 (D.Utah 1995).

While we would not dispute that the instant situation raises separation of powers concerns at the margin, the Government's argument on separation of powers grounds fails to demonstrate clear error in our prior holding. First, the cases the Government cites certainly do not hold that a district court may never disqualify a United States Attorney's Office, but instead mandate that caution is warranted in such circumstances. In this vein, none of the cases the Government cites addresses a situation where the Court found that an Assistant United States Attorney had violated state rules of professional conduct, as we have here. Consequently, our decision to disqualify is not clearly at odds with the principles set forth in *Rochon* and the other cited cases.

Moreover, all of these cited cases predate the enactment of 28 U.S.C. § 530B, the statute that renders Government attorneys sub-

---

dence of irregularities and ambiguities in the decisionmaking process associated with Whittaker's prosecution and have directed that an independent attorney appointed by the Attorney General conduct an independent examination. This decision does not involve the sort of intrusion into the internal affairs of the United States Attorney's Office that the *Abuhouran* panel described.

**21.** The Government repeatedly insists that there was in fact never any difference of opinion, as the victim letter was an error and Whittaker was always a target. However, evaluating the victim letter and its meaning we must take the language of the letter, even though subsequently disavowed by the Government, to be true—or, at

least, to have been true at the time the letter was sent. The point here is that the United States Attorney's Office cannot erase the content of the victim letter by subsequently claiming that it was sent in error or that it contained false statements; definitionally, the transmission of the letter raises substantive questions about the United States Attorney's position on the matter.

**22.** We also observe that if one takes the Government's position here to its logical conclusion, it would leave courts with only one option in the face of ethical breaches by the prosecutors: dismissal. We cannot believe that the Government would truly wish to so restrict the options available to trial courts.

ject to state disciplinary rules. While this legislation does not of course serve to mitigate Constitutional separation of powers concerns, its provisions will doubtless increasingly give rise to cases, like this one, in which the tension between Court's inherent power to discipline attorneys and those Constitutional concerns is more apparent than it has been previously. We might therefore expect the McDade Amendment to alter the playing field with respect to such concerns, and consequently pre-McDade Amendment jurisprudence on the disqualification of Government attorneys is not clearly applicable to the post-McDade Amendment landscape.

Finally, we observe that none of the cases the Government cites is controlling precedent from our Court of Appeals or the Supreme Court. Therefore, to the extent our decision cannot be completely reconciled with their holdings, this fact alone does not demonstrate the existence of clear error in our prior holding.

*Conclusion*

We reiterate that the conduct of the United States Attorney's Office in this episode was extraordinary. Indeed, it was the first incident of its kind involving that Office that we have seen in the hundreds of criminal cases entrusted to us. It may be that since in general the conduct of the United States Attorney's Office is exemplary, and is on the whole better than that of the standard run of counsel appearing before us, those instances in which the Office falls short, like that we face here, are perhaps thrown into sharper relief. However, we do not find this possibility troublesome given the responsibilities of that Office and the weight that this Court typically accords to representations of Assistant United States Attorneys. Indeed, as implied in our June 12 Memorandum, the enviable record of those prosecutors, coupled with the high stakes their cases invariably involve, subject them in the post-McDade ethical world to the highest standards under state professional conduct rules, a result we should think the Government, on reflection, would welcome.

We will deny the Government's motion for reconsideration.

*ORDER*

AND NOW, this 11th day of July, 2001, upon consideration of the Government's motion for reconsideration (docket number 49), and defendant's response thereto, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that the Government's motion is DENIED.