## ARREST WITHOUT A WARRANT.

Court of Appeals for Ashtabula County.

JOHN RASEY ET AL V. VIRGINIA CICCOLINO, ADMINISTRATRIX.

·Decided, December 11, 1913.

*Police—Arrest of Peacable Person on the Highway Without a Warrant—Authoriy to Search One Under Arrest.*

1. A police officer is not authorized to arrest a person, passing peacably along a highway without a warrant, on a mere venture without any knowledge or reliable information, though in fact, as afterwards discovered, concealed weapons were found on the person so arrested.

2. A police officer has no authority to search a person passing peacably along a highway of a municipality until he has placed such person under arrest, and the circumstances must be such as to give reasonable and probable grounds to justify such arrest.

*H. R. Hill,* for plaintiff in error.
*Charles Lawyer* and *M. A. Sonles,* contra.

NORRIS, J.; METCALFE, J., and POLLOCK, J., concur.

The defendant in error, the administratrix, brought an action in the court of common pleas against John Rasey and his bondsmen to recover damages for Rasey causing the wrongful death of her decedent.

John Rasey was a police officer in the city of Ashtabula at the time of the wrongful death complained of, and the other defendants below were on his bond as such officer. It is charged in the petition that Rasey was in the discharge of his duties as a police officer when he wrongfully caused the death of Luigi Ciccolino. The verdict was returned in favor of the plaintiff below and judgment rendered according to the verdict and this proceeding in error is brought to reverse that judgment.

Some rulings of the court below on the questions of law are complained of. The first to which attention is called is the refusal of the court to give certain instructions found on page 141. This is what is contained in the record:·

"And thereupon the defendants requested the court to give in charge to the jury, before argument, the following propositions of law, all of which requests to charge were refused by said court."

Two things might be noted about this record. The first is the request is not made. to give in writing—no such request is made. Second, these requests are asked as a whole and not separately. There could be no error on the part of the court to refuse all of them because they are not asked in compliance with the provision of the statute which says, written requests, and second, unless all of them ought to have been given to the jury, then it was not error of the court to refuse all of them.

We might stop here, but certain rules of law are applicable to this case which might be spoken of in connection with these requests. The court was asked to charge the following:

"The reasonable and probable grounds that will justify an officer in arresting without a warrant, one whom he suspects of felony, must be such as would actuate a reasonable man, acting in good faith.

"The usual and necessary elements of the grounds of suspicion are, that the officer acts upon his belief that the person he is about to arrest is the one guilty of the felony, based either upon facts or circumstances within the officer's own knowledge, or upon information imparted to him by reliable and creditable third persons."

There is not any evidence in this record of any effort on the part of the officer to arrest decedent at any time. There is no evidence that so far as this officer is concerned at the time, that there was any felony for which he was about to, or intended to, arrest the decedent, and that would be sufficient to make this request very properly refused as asked for in accordance with the rules.

Again, this instruction was asked:

"At the time of making an arrest an officer has the right to search the prisoner and take from his person, and hold for the disposition of the trial court, any property connected with the offense charged or that may be used as evidence against him or that may give a clue to the commission of the crime, or the identification of the criminal or any person or implement that

might enable the prisoner to commit an act of violence, or effect his escape.''

Doubtless the law is applicable, but only in case of arrest, and there was no arrest of this man, or attempted arrest.

Third request:

''If John E. Rasey at the time he stopped Luigi Ciccolino, on the night of the shooting, in good faith believed Luigi Ciccolino had concealed on his person a gun or other concealed weapon, he, John E. Rasey, had a right, and it was his duty, to take such weapon or gun from him and to arrest him.''

That statement leads to an investigation perhaps, of the duties and powers of a police officer, under the laws of Ohio, acting without a warrant.

Section 13492 of the General Code reads as follows:

''A sheriff, deputy sheriff, constable, marshal, deputy marshal, watchman or police officer, shall arrest and detain a person found violating a law of this state or an ordinance of a city or village, until a warrant can be obtained.''

I would suggest here that this record fails to disclose any fact indicating that the deceased in this case was at the time of this occurrence violating any law of the state, or any ordinance of the city, in so far as there was any knowledge of this police officer.

Section 13493 reads:

''When a felony has been committed, any person without warrant may arrest another whom he has reasonable cause to believe guilty of the offense and detain him until a warrant can be obtained. If such warrant directs the removal of the accused to another county in which the offense was committed, the officer holding the warrant shall deliver the accused to a magistrate of such county to be dealt with according to law The necessary expense of such removal and reasonable compensation for his time and trouble, shall be paid to such officer, out of the treasury of such county, upon the allowance of the county auditor.''

The claim on the part of the officer with reference to any crime having been committed was, that the Chief of Police of the City of Ashtabula had telephoned him that somebody had com-

mitted some offense in the city of Buffalo in the state of New York, and that he might come in on certain trains that evening, coming in from the east, and to watch the heads of those trains for such person.

There is no evidence in this record anywhere that the deceased answered any description of this supposed fugitive, or that he did anything that night that indicated anything suspicious about him, or that he came from that train. The testimony is that he was peaceably passing westward along the Lake Shore Railroad tracks, until he came to the cross over the north and south railroad, with another companion, with his coat over his shoulder, and had reached within a few hundred yards of his own home, to which he was going, so that there seems to be nothing in this record that would bring the situation of these parties or this officer within any of the provisions of these statutes, and as they have been interpreted by our courts. It does not follow from this law that an officer may interrupt any one whom he sees passing peaceably along the ways of the city. There must have been such situation, such suspicious circumstances, such surrounding conditions that a reasonably prudent man might believe the person so passing to have been guilty of crime, that he would be authorized to detain him long enough to procure a warrant.

In the case of *Ballard* v. *State,* 43 O. S., 340, it is said in the opinion of the court on page 345:

"Under these circumstances, we think the officer was in the performance of official duty. This does not authorize such an arrest without a warrant on a mere venture, without knowledge or reliable information, though in fact, as afterward discovered, concealed weapons were found."

See also *State* v. *Lewis,* 50 O. S., 179. In the case of *Britton* v. *Granger,* 7 C. D., 182, the third syllabus reads:

"To constitute a probable cause so as to warrant the arrest of a person for the commission of a crime, there must be such circumstances and surrounding facts as will lead a person of ordinary prudence to believe in the guilt of the person arrested, and if the facts show that to be the case, then there is probable cause for the arrest."

Now, that perhaps is sufficient to dispose of these requests. And now as to the charge of the court which is found on page 152 of the record, and on that page the court defines the rule of law as to self-defense.  It was finally claimed on the part of the defendants below that this officer shot the deceased in self-defense, and we think the court very fairly gave the rule to the jury governing that feature of the case.  The law that is given is as favorable to the defendants as they had a right to ask.

Now, it is insisted further that this verdict is against the evidence.  I shall state in brief the situation of the parties. This deceased, Ciccolino, and another man by the name of Tuscano, were passing along the railroad tracks of the Lake Shore Railroad, going westward to their homes, there is no dispute about that.  This officer overtook them and first stopped the companion of the deceased, and this is what he says occurred:

"I came to the first fellow.  I don't his name, and said, 'What you got on you?'  He says, 'Nothin.'  I put my hands over him and thought I felt something in his hip pocket and looked and found a razor in a box, and gave it back to him.  Q. Then what did you do?  I stepped by him and said to the other fellow, 'What you got on you?'  Luigi Ciccolino says, 'You no take my money?' or something like that, and put his hand towards his hip pocket.  I grabbed him by the shoulder, put my right hand on his shoulder, he had an overcoat thrown over his shoulder, I think, I don't recollect how it was, and he commenced to resist—(Mr. Lawyer: Object.  The Court: Tell what he did.) He tried to get away from me.  I was satisfied that he had a gun on him or he wouldn't resist.  Q. Go ahead, tell what happened?  He broke away from me, and I took my club and hit him on the left shoulder with it, his overcoat was on that shoulder, hit him on the left shoulder, and just then he drew a gun.  Q. Where did he take the gun from?  Hip pocket, I suppose, from the rear of his clothes somewhere.  Q. After he broke away and pulled the gun, were you moving at that time?  Not at that time.  Q. What did you do?  I jumped back, put my club up and pulled my gun from my overcoat pocket and hollered, 'Drop that gun or I'll shoot.'  Then he brought the gun up on me in about this position—(Mr. Lawyer, What position?)  Not quite level and brought it up like this, and then I shot four times.  Did you fire until he pulled his gun and started to level it?  No, sir, he had levelled it when I commenced.  Q.  When he drew the gun how far would you say

you were apart? I should judge in the neighborhood of eight or ten feet, as near as I can recollect. Q. And about where at that time? Just a little east of the cross-over, going wesт. Q. Where was Carmine Tuscano at that time? I don't know, didn't see him after I searched him. Q. He wasn't around at the time of the shooting? No. sir. When you left him to search the other fellow, that was the last you saw of him? Yes, I think he went off. Do you know whether he ran or walked? Don't know. Then what happened? I fired four shots and he turned to the left and ran on until he fell down, ran I should think 150 feet, then I see some people in the tower and went over there and asked if there was a telephone there, and they said there was a Bell.''

And then he telephoned to the chief of police.

Again, to show what occurred by his testimony:

''Q. You seem to be able to remember some things quite well. What did you say when you turned after seaching that man Tuscano? I can't remember exactly. Q. Now, how far was this other man, Ciccolino, standing from you when you searched Tuscano? Well, he stood on the left side of him, on my right, stood about two or three feet from him. Q. While you were searching the other man Ciccolino make no attempt to do anything, did he stand right there? No, sir. Q. Ain't that true that all the time you were searching this man, that Ciccolino stood right there where he was in the first place and never tried to get away? No, sir. Q. Well, what did he do while you were searching Tuscano? Ciccolino started off. Q. Started which way? Towards the west across the Lake Shore. Q. How far had he got before you said anything to him? Oh, just a few steps off. Q. A few steps, how many? About six or eight. Q. How far? Well, four feet I should think ＊ ＊ ＊'' and so on.

''Q. When you hollered to him to hold on a minute, did he stop? Yes, sir. Q. Tell what occurred, what was done or said? I came up to him to search him. Q. Didn't you say to him 'What have you got?' You said that to him, didn't you? I don't know. Can't remember that now. Q. And he said 'You can't take my money?' Yes sir.''

This is *his* statement of what occurred.

The other witness who was there part of the time, testified quite differently,—that before any proceedings had taken place, that the police officer struck the deceased over the side of the

head with his club, and there was evidence of a scar on the side of his head. as testified to by people who examined the body afterwards. And testimony of other disinterested witnesses was that these four shots did not all come at one time; that two of them took place one right after the other then a short interval, then the other two. This man was hit twice, once in the abdomen and the other in the leg.

But, was the officer justified by his own statement in what he did at that time—and is it necessary in order that we may have police protection that we justify such proceedings on the part of a police officer?

This deceased, as the testimony shows, was foreman on the tracks of the Lake Shore Railroad, and had lived there a number of years. As I have stated, these two persons were peaceably passing along the railroad track on the way to their homes, no pretense that they were violating any law; there is no pretense on the part of the police officer in his testimony that he thought either of them had been violating the law, but he had a suspicion that each of them might be carrying a concealed weapon, and he searched the first one and then attempted to search the other, and because the other man perhaps, did not yield gracefully to a search by a policeman who may meet him anywhere, he raps him over the head. The officer claims he struck him on the shoulder but there doesn't seem to be any reason for either blow, the one which he admits having given, or the other which the testimony shows, and the jury might well find, was given.

And he says the other man pulled out a gun, thereupon he told him to put it up, and without waiting for him to do so he shot four times, and that he was eight or ten feet away, he says. He was not, as I have stated, in this testimony, in any way attempting to arrest this man. Neither is there any statement on his part that he did arrest him, or that he desired to put him under arrest. If he had wanted to escape this gun he could have very easily done so. He simply wanted to search him. There is no evidence that he found anything about him to indicate that he was this person from Buffalo he was hunting.

The other man, Tuscano, says that this man did not pull any revolver out. The testimony shows that he had a revolver but

that it was carried in the inside pocket of his coat, and it was found under his body after he was shot. The jury could well find that he did not even take out his gun. And the jury was abundantly justified in so finding.

We think this officer largely exceeded any authority he had as a policeman of the city of Ashtabula, and that the jury were justified in finding that he wrongfully, acting as a policeman, caused the death of this decedent, and that there is no error in the record, and the judgment is affirmed.