

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-18-2001

# USA v. Whitaker

Precedential or Non-Precedential:

Docket 01-2874

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Whitaker" (2001). *2001 Decisions.* Paper 243.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/243

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 11, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2874

UNITED STATES OF AMERICA,
        Appellant

v.

WAYNE WHITTAKER

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Docket No. 01-00107)
District Judge: Honorable Stewart Dalzell

Argued September 25, 2001

Before: BECKER, Chief Judge, and SCIRICA and
GREENBERG, Circuit Judges

(Filed: October 11, 2001)

        Patrick L. Meehan
        United States Attorney
        Robert A. Zauzmer (argued)
        Assistant United States Attorney
        Chief of Appeals
        615 Chestnut Street
        Philadelphia, PA 19106

         Attorneys for Appellant

Samuel C. Stretton (argued)
301 South High Street
P.O. Box 3231
West Chester, PA 19381-3231

Attorney for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on the appeal of the United States from an order entered in the district court on June 13, 2001, disqualifying the United States Attorney's Office for the Eastern District of Pennsylvania from representing the United States in this criminal prosecution for mail fraud in violation of 18 U.S.C.S 1341. The order also directed the Attorney General forthwith to appoint an attorney to represent the Government in the case and required the special attorney to advise the court by August 15, 2001, whether he or she intends to continue this prosecution. The district court effectively has stayed the June 13, 2001 order pending this appeal, and thus the Attorney General has not made the appointment.

The background of this case is as follows. For some years, the United States Attorney for the Eastern District of Pennsylvania has been investigating chop shops in the Philadelphia area. A chop shop dismantles motor vehicles that usually, though not always, are stolen so that the parts can be sold. Assistant United States Attorney Robert K. Reed has conducted the investigation, which obviously has been a major undertaking as the losses arising from the dismantling of thousands of motor vehicles have been about $40,000,000.

In about 20% of the cases investigated, however, the vehicles actually were not stolen. Rather, their owners cooperated in their purported "theft" to avoid lease or loan payments. Inasmuch as insurance companies pay for the

2

lost vehicles, these consensual "thefts" are called "insurance give-ups."

In 2000 and 2001 the Government investigated Whittaker for possibly engaging in an insurance give-up of his vehicle. In November 2000, a grand jury subpoenaed Whittaker, seeking samples of his handwriting and his fingerprints. Subsequently, he retained Samuel Stretton, a Pennsylvania attorney, to represent him. On November 30, 2000, pursuant to a grand jury subpoena, Whittaker was fingerprinted and photographed.

At the same time the investigation apparently was culminating. On January 29, 2001, pursuant to 42 U.S.C. SS 10606 and 10607, Reed signed a letter addressed to approximately 300 people who owned cars that were dismantled in the chop shops to advise them of the progress of the investigation and to invite them to file victim impact statements or to make inquiry with respect to the case with certain specified Government personnel.

Reed prepared the letter, but he did not send it personally. Rather, he provided a paralegal in his office with a list of persons whose vehicles had been dismantled. This list included persons the Government suspected had participated in insurance give-ups. Reed, however, instructed the paralegal not to send the letter to these suspects. Unfortunately, the paralegal erroneously sent the letter to everyone on the list, including Whittaker.

As might be expected, Whittaker contacted Stretton about the letter. On February 11, 2001, Stretton wrote the assistant United States Attorney particularly assigned to Whittaker's case, Mark S. Miller, about the matter. Stretton's letter referred to Reed's January 29 letter and ended by saying "[w]ould you please call me." Miller, as requested, promptly called Stretton and told him that the January 29 letter was a mistake and that Stretton should disregard it. Then, on February 22, 2001, a grand jury indicted Whittaker for mail fraud, the victim being the Colonial Penn Insurance Company, which insured his vehicle and paid $25,664.50 to World Omni Financial Corp. on its lease balance.

3

Thereafter, Whittaker, through Stretton, moved to dismiss the indictment. After explaining the background of the case, his motion recited that:

6. The aforementioned [January 29, 2001] letter provides information for Mr. Whittaker as a victim.

7. The United States Attorney's Office has therefore exculpatory evidence that would demonstrate Mr. Whittaker is a victim and is not and should not be a Defendant.

8. Despite Mr. Reed's investigation and conclusions, Mr. Whittaker is being charged and has a case pending out of the same matter where he is charged as a defendant by a separate United States Attorney in the same office.

9. It is unfair for the United States Attorney's Office to take the position that the Defendant is a victim and not someone who is criminally culpable, and yet have the same office take an entirely different position on the same investigation.

10. The Defendant contends that the government is acting in bad faith as a result . . ., and is acting in violation of his right to due process pursuant to the Fifth and Fourteenth Amendments of the United States Constitution and respectfully requests that the charges be dismissed.

App. at 63-64. Significantly, the motion did not suggest that the January 29 letter caused Whittaker to take any action adverse to his defense such as discarding evidence prior to Miller's notification to Stretton of the mistake. Nor did the motion suggest that the Government used the letter for any improper purpose, such as to gain an interview with Whittaker to obtain incriminating evidence. Of course, as Stretton knew or should have known, the premise of the motion that the Government had evidence exculpating Whittaker was at best doubtful as Miller had told him before Whittaker's indictment that the letter should be disregarded. Moreover, Stretton never has produced any evidence to counter the Government's explanation that Reed's paralegal sent the letter erroneously.

4

The motion came on before the district court on May 24, 2001. At that time Reed was the only witness who testified on the motion. He described the large scope of the investigation which already had led to about 60 convictions with many cases still pending. He stated that about 20% of the chopped cars were insurance give-ups. He explained the procedure that led to sending the victim notification letters, indicating that "I did not intend to notify -- I mean certainly it would have undermined what we were trying to do with respect to people that were potential targets or targets of our investigation." App. at 117. He testified that the fact that the letter went "to someone like Mr. Whittaker, it went to other people as well, as I indicated, inadvertently and totally by mistake is just what it was." App. at 118. He also said that he delegated "the task [of sending the letters] to a paralegal." Id.

On further examination by the court and by Stretton, Reed acknowledged that the mistake in sending the letter could have been avoided. He also acknowledged that he was not aware of any letter the Government sent to Stretton correcting the January 29 letter.

After Reed completed his testimony, Miller and Stretton stipulated that Miller orally advised Stretton that the letter was sent in error and that Miller never made a written response to Stretton's February 11, 2001 letter. However, the stipulation did not include any suggestion that Stretton asked for such a letter to supplement Miller's oral statement.

The court then ruled on the motion to dismiss, holding that it would not dismiss the indictment "because I don't think it's outrageous conduct." App. at 137-38. The court, however, treated the motion to dismiss the indictment as a motion to disqualify the United States Attorney because it thought that there was "a very serious issue of professional conduct under, at a minimum, Rules of Professional Conduct 1.7, 1.8, 1.9," referring to Pennsylvania rules governing the conduct of attorneys. App. at 138. Thus, the court ordered that unless the Attorney General appointed a special prosecutor, the parties should file memoranda on the disqualification issue. Stretton then suggested that perhaps Pennsylvania Rule 4.2 also was implicated but that

5

he wanted "to emphasize to the Court that, despite the tone of my questions to Mr. Reed, I'm not alleging that he did act in bad faith." App. at 138. The court then agreed, saying "I certainly don't believe that he did act in bad faith." Id. Stretton and the court then agreed that there was no basis for disciplinary action to be taken against Reed and that he is a "fine person." Id.

The district court disposed of the matter in its opinion entered June 13, 2001. See United States v. Whittaker, 201 F.R.D. 363 (E.D. Pa. 2001). The opinion incorrectly started by indicating that "[b]ecause the same United States Attorney's Office regarded him a perpetrator and a victim of the same alleged insurance fraud, defendant Wayne Whittaker has filed a motion to disqualify that office for its ethical breaches." Id. at 365. This sentence was wrong for two reasons. First, of course, the United States did not regard Whittaker as a crime victim, but merely inadvertently sent him a letter identifying him as a victim and then, when Whittaker's attorney, Stretton, inquired about the letter, corrected the mistake. The district court certainly was well aware of these facts. Second, Stretton did not file a motion seeking Reed's or the United States Attorney's disqualification. Rather, the court, after raising the disqualification issue in colloquy with counsel at the May 24 hearing, on its own initiative converted Whittaker's motion to dismiss the indictment into a motion to disqualify the United States Attorney's Office, and Whittaker effectively joined in the court's motion. The court then continued its opinion stating that it had found no other case "presenting such extraordinary conduct." Id.

The court subsequently indicated that Whittaker in his supplemental submission following the May 24 hearing, identified "no less than eight Rules of Professional Conduct which he believes the Government breached when its left hand called him a criminal and its right hand called him a victim of the same scheme," id. at 365, including violation of:

> Rule 1.7, which generally bars conflicts of interest (Whittaker contends that as the January 29 letter purported to be helping him at the same time the

6

Government was seeking to prosecute him, this constituted such a conflict);

Rule 1.9, which bars a lawyer from taking a position adverse to a former client in the same or a related matter;

Rule 3.8, which outlines the professional responsibilities of a prosecutor, and in particular Rule 3.8(a), which bars a prosecutor from bringing a claim that he knows is `not supported by probable cause';

Rule 4.1(a), which bars attorneys from making false statements of fact to third persons (Whittaker maintains that the January 29 letter's statement that he was a `victim' constitutes a false statement pursuant to this Rule);

Rule 4.2, which precludes contact with someone the Office knew was `represented by another lawyer';

Rule 4.4, which bars the collection of evidence by methods that could compromise the rights of a third party (Whittaker asserts that the letter constituted an effort to obtain a statement in violation of this Rule);

Rule 8.4(c), which bars conduct involving `misrepresentation'; and

Rule 8.4(d), which bars conduct `prejudicial to the administration of justice'.

Id. at 365-66. The court also pointed out that Whittaker cited Rule 3.7(a), which provides that "a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," id. at 366, explaining that, apparently because of the January 29 letter, Reed might be a witness at the trial. Id. The court then set forth that Reed testified that the sending of the letter was inadvertent. Id.

In its analysis, the court indicated that the Pennsylvania Rules of Professional Conduct were applicable by reason of 28 U.S.C. S 530B(a), which provides that a Government attorney "shall be subject to State laws and rules . . . governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." Id. The

7

court found, however, that there had not been violations of Rules 1.7 and 1.9. See id. at 368. But the court went on to say that "the never-retracted January 29, 2001 letter" was a "palpable falsehood" as the Government itself demonstrated by a May 31, 2001 letter, filed after the May 24, 2001 hearing, explaining "its definitive position" that Whittaker "is a criminal." Id. Indeed, the district court said that it was not until it sent the May 31 letter that the Government "stat[ed] this conclusion." Id. Of course, the court's characterization of the January 29 letter as being unretracted until that time was inaccurate as, in conformity with Stretton's request, Miller had called Stretton before Whittaker's indictment and explained that the letter was erroneous and should be disregarded.

The court then found that the January 29 letter was a "false statement of material fact" sent in violation of Rule 4.1. See id. at 369. The court, however, relying on United States v. Balter, 91 F.3d 427 (3d Cir. 1996), held that Rule 4.2 had not been violated. See id. at 370.

The court also held that Rule 4.4 was not violated because "there is no evidence, for example, of the Government's using the January 29 victim letter to inveigle information or admissions from Whittaker, or of other malign purpose that might have approached outrageousness." Id. at 371 n.13. The court, however, found that there had been a violation of Rule 8.4(d), apparently partly because the United States Attorney's conduct in this matter had been "cavalier" and Reed had been amused when he testified at the May 24, 2001 hearing. See id. at 370-72. In this regard, the court indicated that Whittaker had been on a roller coaster. The court said that :

> We also know from AUSA Reed's concession, N.T. 46, that Whittaker was not alone in riding this Government-built roller coaster. While these other target-victims are not before us, their existence confirms the seriousness of the fiasco we consider here. In its repeated unprofessional conduct, the Office has here prejudiced the administration of justice and undermined public confidence in a most sensitive part

of our legal institutions. The United States Attorney's Office thus transgressed RPC 8.4(d).

Id. at 371.[1] As far as we can ascertain, the court's reference to "repeated unprofessional conduct" simply meant that the United States Attorney erroneously sent the letter to other persons the Government thought were implicated in the offenses.

The court next dealt with the remedy, indicating that it "found breaches of three Rules of Professional Conduct," meaning Rules 4.1, 4.3(c) and 8.4(d). Id. The court then cited In re Corn Derivatives Antitrust Litig. , 748 F.2d 157, 162 (3d Cir. 1984), for its need to apply a balancing test in determining whether it should disqualify the United States Attorney. After discussing the parties' interests, the court said that "there can be no doubt that our interest in protecting the integrity of the proceedings and maintaining public confidence in the judicial system favors disqualification." Whittaker, 201 F.R.D. at 372. The court nevertheless went on to indicate that the Government acted "without bad faith or malintent [sic]" and that its "conduct is towards the lower end of the egregiousness spectrum for prosecutorial errors." Id. It held that the Government's "behavior . . . may bring our system into disrepute with the citizenry if the judiciary condones it." Id . It thus directed the Attorney General to appoint an attorney from outside the Eastern District of Pennsylvania to assume responsibility to prosecute this case pursuant to 28 U.S.C. S 543. See id. at 373.

The Government then moved for reconsideration, but the court denied the motion in a memorandum dated July 11, 2001. See United States v. Whittaker, 201 F.R.D. 373 (E.D. Pa. 2001). We will not discuss the memorandum at length, but we do point out that in it the court clarified its reasons for finding that the Government's conduct violated Rule 4.3(c), concerning situations in which attorneys are dealing with unrepresented persons. In particular, the court held

_____

1. While other targets may have been on the roller coaster ride they apparently were not too troubled by it as, according to the United States Attorney's representation at oral argument, none has filed any motion seeking relief by reason of the receipt of the letter.

that the Government did not make a reasonable effort to correct the misunderstanding it created with the January 29 letter merely by correcting it with the "oral representation to counsel." Whittaker, 201 F.R.D. at 377. The Government then appealed.

II. JURISDICTION

As always, we first must consider jurisdiction. Plainly, the district court had jurisdiction under 28 U.S.C.S 3231. The matter of our jurisdiction is not so simple. The United States takes the position that we have appellate jurisdiction under 28 U.S.C. S 1291 pursuant to the collateral order doctrine stemming from Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221 (1949). On the other hand, Whittaker contends that we do not have appellate jurisdiction as this appeal is of a pretrial, rather than a final order. See Gerardi v. Pelullo, 16 F.3d 1363, 1369 (3d Cir. 1994).

Ordinarily, a court of appeals does not have jurisdiction over an appeal from a pretrial order during the pendency of the proceedings in a district court. See Comuso v. National R.R. Passenger Corp., No. 00-1491, 2001 WL 1167268, at *3 (3d Cir. Oct. 3, 2001). Under the collateral order doctrine, however, a court of appeals has jurisdiction if:

> (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment.

Collinsgru v. Palmyra Bd. of Educ., 161 F.3d 225, 229 (3d Cir. 1998), quoting In re Ford Motor Co., 110 F.3d 954, 958 (3d Cir. 1997). Plainly the order meets the foregoing criteria. To start with, the order conclusively determines that the United States Attorney for the Eastern District of Pennsylvania is disqualified in this case and cannot participate in its prosecution. Thus, the order was not tentative or subject to later revision as the conduct of which the district court complained already was ameliorated fully by the time the court disqualified the United States

10

Attorney. Thus, there is no possibility under the order that, depending upon future events, the district court might reconsider its position.

Second, the order unquestionably resolves a jurisprudentially important issue completely separate from the merits of the dispute concerning whether Whittaker committed mail fraud, a charge to which he has pleaded not guilty. Moreover, the issue of whether the United States Attorney in the district of the prosecution may represent the United States surely is important, particularly in a case such as this in which the prosecution is part of a much larger criminal investigation.[2]

Finally, the order almost certainly will be unreviewable later in this case. In the overwhelming majority of criminal cases in which, as here, the defendant pleads not guilty, the case ends either when the jury finds the defendant guilty or not guilty and, if guilty, the defendant is sentenced. The United States correctly concedes that it cannot appeal from a judgment of not guilty for constitutional reasons, and it ordinarily would not be able to appeal from a judgment of conviction and sentence, as it would be the prevailing party. See Forney v. Apfel, 524 U.S. 266, 271, 118 S.Ct. 1984, 1987 (1998); Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671 (1962). While we can conceive circumstances in which the United States could appeal, such as, perhaps, if the court enters a judgment of acquittal after a jury verdict of guilty, we do not regard such remote possibilities as undermining our conclusion that the order of disqualification effectively will be unreviewable on appeal from a final judgment.[3]

We recognize, of course, that the Supreme Court has held that a criminal defendant may not appeal immediately from

_____

2. We do not suggest that this case would not involve an important issue if the prosecution here was unrelated to any other case.

3. We are well aware that there is a certain risk in making appealability determinations on the basis of consideration of the future course of litigation. See Hensley v. Northwest Permanente P.C. Ret. Plan & Trust, 258 F.3d 986, 994 n.3 (9th Cir. 2001). Here, however, inasmuch as this rather straightforward criminal case is likely to go down a well-traveled path, the risks are minuscule.

11

the pretrial disqualification of his attorney. But unquestionably if the defendant is convicted, he may raise the disqualification issue on appeal. See Flanagan v. United States, 465 U.S. 259, 266, 104 S.Ct. 1051, 1055 (1984) ("[A] constitutional objection to counsel's disqualification is in no danger of becoming moot upon conviction and sentence."). Thus, the position of a defendant with respect to the disqualification of his attorney is materially different from that of the Government in a criminal case and Flanagan therefore is not controlling.

We also recognize that when a court disqualifies counsel in a civil case, its order is not immediately appealable. See Richardson–Merrell, Inc. v. Koller, 472 U.S. 424, 426, 105 S.Ct. 2757, 2758 (1985); see also Comuso, 2001 WL 1167268, at *4. There, too, however, an appeal after final judgment is not precluded because "if the client obtains an unsatisfactory judgment with substitute counsel, the disqualification ruling may be challenged on appeal of a final judgment." Id. at 435, 105 S.Ct. at 2763. Accordingly, Richardson–Merrell is no more controlling here than Flanagan.

Insofar as we are aware, we have not addressed the issue of whether the United States may appeal from an order disqualifying a United States Attorney from prosecuting a criminal case. The United States, however, cites three cases addressing the point, and all conclude that the United States immediately may appeal from such an order. See United States v. Vlahos, 33 F.3d 758, 761 (7th Cir. 1994); In Re Grand Jury Subpoena of Rochon, 873 F.2d 170, 173 (7th Cir. 1989); United States v. Caggiano, 660 F.2d 184, 189–90 (6th Cir. 1981). Whittaker does not cite any case holding to the contrary.

We carefully have reviewed these cases and have concluded that we should join with them. As the court explained in Rochon after discussing Flanagan:

> An order disqualifying government counsel in a criminal case, however, is a different matter, for if it is not immediately appealable, it is effectively unreviewable. For example, in this case, if the grand jury declines to issue any indictments, the government

12

could not appeal because the case would be over. If the
grand jury does issue indictments and any defendants
subsequently are found guilty, the government, of
course, would not seek review. If, on the other hand,
any defendants were found not guilty, appellate review
of the district court's disqualification order would be
precluded by the double jeopardy clause. Thus, in the
only instance in which the government would want to
press an appeal, the district court's decision preventing
the [attorney general] from participating in the grand
jury investigation is unreviewable.

Rochon, 873 F.2d at 173 (citation omitted).

Finally, we point out that if we found that we did not
have appellate jurisdiction, we could and would exercise
mandamus jurisdiction. The situation here is like that in
Vlahos in which the court, after concluding that the
collateral order doctrine supported its jurisdiction,
indicated that even if it had held differently, it would
exercise mandamus jurisdiction because "the district court
exceeded the boundaries of its lawful role by prohibiting the
designated representatives of the Executive Branch from
prosecuting this criminal contempt action." Vlahos, 33 F.3d
at 762. In Hahnemann University Hospital v. Edgar, 74 F.3d
456, 461 (3d Cir. 1996) (internal quotation marks omitted),
we said that a court "should grant [mandamus] only in
extraordinary circumstances in response to an act
amounting to a judicial usurpation of power." As will be
seen, the Edgar circumstances justifying mandamus are
present here. Nevertheless, we do not issue mandamus as
it "should not be issued where relief may be obtained
through an ordinary appeal." Id. In view of our holding
under the collateral order doctrine, that is the situation
here.

III. STANDARD OF REVIEW

Our standard of review on an attorney disqualification
issue includes both deferential and de novo elements. To
the extent that the district court made factual findings, our
review is for clear error, though in this case the historical
facts are not in dispute. On the other hand, we exercise

13

plenary review to determine whether the district court's disqualification was arbitrary in the sense that the court did not appropriately balance proper considerations of judicial administration against the United States' right to prosecute the matter through counsel of its choice, i.e., the duly appointed United States Attorney. See United States v. Stewart, 185 F.3d 112, 120 (3d Cir.), cert . denied, 528 U.S. 1063, 102 S.Ct. 618 (1999). If the disqualification was not arbitrary, we use an abuse of discretion standard in reviewing the court's decision. See id. In this case, however, the selection of the standards of review is not important as we would reach the result that there was no basis for the court to disqualify the United States Attorney regardless of how deferential our review might be.

IV. DISCUSSION

It is perfectly clear that the district court had no basis to disqualify the United States Attorney in this case. The undisputed facts are that Reed did not intend that the January 29 letter be sent to Whittaker or any other person who the Government believed had cooperated in an insurance give-up. Unfortunately, a paralegal in his office did not follow his mailing instructions. But, as even the district court recognized, Reed acted in good faith. The worst thing that can be said about Reed in particular and the United States Attorney's office in general is that they were negligent.

Significantly, Whittaker makes no claim that his receipt of the January 29 letter in any way prejudiced his defense, such as leading him to destroy exculpatory evidence upon its receipt. Moreover, the United States did not attempt to gain any tactical advantage from the letter as, for example, attempting to interview Whittaker after sending it.

Notwithstanding the undisputed fact that the United States simply made a mistake in sending out the victim impact letters, the district court in an unjustified conclusion found that the United States through its attorney made "a false statement of material fact or law to a third person" in violation of Rule 4.1. Indeed, the district court went so far in its opinion as to label the section

14

dealing with Rule 4.1 as "The Government's Admitted Falsehood." Whittaker, 201 F.R.D. at 368. Of course, the letter should not have been sent, but this case involved a mistake, not a lie, and the district court certainly should have treated it in that way. In this regard, we point out that it is not unusual for parties in a judicial proceeding to correct mistakes. For example, every judge and attorney knows that pleadings and answers to interrogatories often are amended.[4] In the circumstances, neither Reed nor his office violated Rule 4.1.

The court also found that the United States Attorney did not comply with Rule 4.3(c), which provides that when a lawyer knows or reasonably should know that an unrepresented person misunderstands that lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding. Even though the Government knew that Stretton represented Whittaker, the district court treated Rule 4.3(c) as applicable to its direct communication with Whittaker, and we will accept this treatment of the rule on this appeal. What we cannot accept is the court's finding that the oral representation to Stretton that the January 29 letter had been a mistake was not a reasonable effort to correct the misunderstanding. While the court apparently believed that the Government should have sent a letter further explaining the error, that conclusion ignores the fact that on February 11, 2001, Stretton wrote Miller and requested that he "please call" him and Miller did exactly that. Thus, the United States corrected its mistake precisely as Stretton requested and, accordingly, complied with Rule 4.3.[5] In sum, we reject the district court's findings that the United States Attorney did not make reasonable efforts to correct the misunderstanding it created by sending the January 29 letter.

We also reject the court's conclusion that the Government did not state "its definitive position" that

_____

4. Fed. R. Civ. P. 60(a) and 60(b)(1) deal with correcting mistakes.

5. We do not hold that our result would have been different if Stretton did not request a telephone call. Rather, we simply predicate our result on the facts before us.

15

"Whittaker is a criminal" until it sent its May 31, 2001 letter. The grand jury indicted Whittaker on February 22, 2001, and he appeared in court and pleaded not guilty on March 8, 2001. Surely, by obtaining the indictment, the Government made clear, quite aside from its statement to Stretton to disregard the letter, that it considered Whittaker to be a criminal. Indeed, the only way the district court could have avoided this obvious conclusion would have been to believe that a run-a-way grand jury returned the indictment.

Finally, the court found that the United States violated Rule 8.4(d) by its conduct "prejudicial to the administration of justice." Whittaker, 201 F.R.D. at 370-71. The court reached this conclusion because of what it deemed was the seriousness of the United States Attorney's "repeated unprofessional conduct," which the court believed "undermined public confidence in a most sensitive part of our legal institutions." Id. at 371. We reject this unjustified finding. The only thing the United States Attorney did was send a letter to Whittaker and to certain other persons by mistake. Moreover, we reiterate that it promptly clarified the situation when Stretton inquired about it. In the circumstances it is not true that the Government prejudiced the administration of justice. Indeed, we do not doubt that if the court simply had denied the motion to dismiss without converting it into a request to disqualify the Government's attorneys, these proceedings would have gone unnoticed.

We recognize that the district court was concerned that Reed might be called as a witness at the trial. See id. at 366, 379-80. While we do not intend our opinion to be regarded as an in limine admissibility ruling, we do state that it is questionable that the court, upon reflection, will permit Whittaker to elicit evidence regarding the January 29 letter before a jury. The letter indisputably was sent in error and thus Reed did not send it because he had evidence exculpatory as to Whittaker. Accordingly, inasmuch as the trial concerns mail fraud it is difficult to understand how the letter could "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

16

without the evidence." Fed. R. Evid. 401. Therefore the district court well may hold that if Whittaker attempts at trial to use the January 29 letter that it is not admissible into evidence.

V. CONCLUSION

This panel regrets having to file an opinion so critical of a district court. After all, the members of this panel have had more than 80 years of judicial service on the trial and appellate benches in the state and federal courts and recognize that a judge, like anyone else, can have a bad day. Here, however, the district court's unjustified view of this matter extended over a period of weeks during which it had an opportunity to reconsider its position, particularly when the Government moved for reconsideration. But the district court adhered to its unjustified conclusions, seemingly losing all sense of proportion. For the foregoing reasons, the order of June 13, 2001, will be reversed, and the case will be remanded to the district court for further proceedings.6

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

6. In view of our conclusion, we need not consider issues addressed in the briefs of whether, and if so under what conditions, a court should disqualify an attorney for violation of the Rules of Professional Conduct or whether separation of powers considerations precluded the disqualification here.

17