**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2581
_____

UNITED STATES OF AMERICA

v.

SAMIRKUMAR J. SHAH,
        Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Crim. Action No. 2-16-cr-00110-001)
U.S. District Judge:  Honorable David S. Cercone
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 8, 2022
_____

Before:  SHWARTZ, KRAUSE, and ROTH, <u>Circuit Judges</u>.

(Filed: July 22, 2022)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SHWARTZ, Circuit Judge.

Samirkumar Shah appeals his conviction and sentence for health care fraud. Because the District Court correctly denied his motions to disqualify the United States Attorney's Office ("USAO"), for a continuance, and for a judgment of acquittal, and because his sentence is procedurally and substantively reasonable, we will affirm.

I

A

Shah practiced cardiology in multiple offices in Pennsylvania. Among other things, Shah prescribed external counterpulsion (ECP) treatment, which is designed to increase blood flow to the heart using compression cuffs around the patient's legs while they are lying down. Shah purchased ECP beds and billed insurers, including Medicaid and Medicare plans, for ECP treatment.

Medicaid and Medicare have three limitations for reimbursement of ECP treatment. First, the programs cover ECP treatment only for patients who suffer from angina (chest pain). Second, the programs will only reimburse for ECP treatment that was conducted under a physician's direct supervision. Third, the programs restrict billing for reimbursement. Specifically, a system of codes is used to identify the service rendered, and each coded service is assigned a price. ECP treatment is assigned code G0166, which is a "bundled code" because it includes companion treatments.[1] App. 197. As result, physicians who bill code G0166 may not also bill the separate codes for the

---

[1] The companion treatments bundled in G0166 include echocardiograms, Doppler tests, pulse oximetries, and plethysmographies.

2

companion treatments on the same day "unless they are medically necessary and delivered in a clinical setting not involving ECP therapy." S. App. 6. The ECP bed supplier provided Shah with guidelines informing him of these limitations.

Insurers audited Shah's billing and told him that he improperly billed ECP treatments by using both the G0166 code and codes for companion treatments and that the medical necessity of many of his ECP treatments was unsubstantiated. Although Shah's agreements with insurers required that he only seek reimbursement for medically necessary treatments, and he told one insurer that he instructed his billing department to remove the incorrect codes, he in fact directed his third-party billing service to continue billing "[a]ll four codes." App. 836.

In addition to ignoring insurers' directives, Shah (1) prescribed ECP for patients, including an undercover agent, who did not suffer chest pain, telling some patients that ECP treatment would make them "younger and smarter" and could help with conditions including high and low blood pressure, obesity, erectile dysfunction, and restless leg syndrome, App. 385; and (2) was "very often" not present—nor was any doctor—to supervise patients' ECP treatments, App. 457-58. Shah (1) told his staff that all patients had angina; (2) instructed staff to "beef[] up" patient files before insurance reviews, long after treatment was provided, App. 327; and (3) used pre-printed forms that included angina diagnoses. Notably, during an interview with the Pennsylvania Attorney General's Office, Shah stated that he reported angina diagnoses for patients who did not have that condition "[f]or reimbursement purposes." App. 1151.

3

B

A grand jury indicted Shah for two counts of health care fraud in violation of 18 U.S.C. § 1347.

On the first day of jury selection, Shah moved to disqualify the entire USAO and sought a continuance to conduct additional discovery.

Shah's disqualification motion arose out of his prior representation by Tina Miller, who represented Shah until June 2017, and then, ten months later, joined the USAO as a supervisory Assistant U.S. Attorney ("AUSA"). Shah argued that because Miller became a supervisor in the office prosecuting him, there was "both a conflict of interest and an appearance of a loss of impartiality." D. Ct. ECF No. 145 at 7. The District Court denied the motion, noting that it did not "see any issue of any facts demonstrating a conflict of [interest]" and emphasizing the need to avoid delaying the trial. App. 67.[2]

Shah also sought a continuance so he could have an expert review 350 patient files seized from his offices. The Government responded that the records had been available

---

[2] After the Court ruled, it received declarations from Miller and the two AUSAs handling the trial. Miller stated that she did not discuss employment with the USAO when she represented Shah and, once she joined the office, she had no discussions about or involvement in any cases in which she had played a role while in private practice. She also represented that she divulged no confidential information learned during her representation of Shah to any USAO employee or investigative agency. The two AUSAs' affidavits likewise stated that Miller was not involved in Shah's prosecution and did not divulge any client confidences. One AUSA added that her only discussion with Miller regarding Shah's prosecution involved her telling Miller that she was unable to assist on a separate matter because she, unbeknownst to Miller, "would be in . . . the trial of [Shah]." App. 90.

After trial, the District Court revisited Shah's disqualification motion, again held that disqualification of the entire USAO was inappropriate "given the lack of . . . Miller's

to him for years and thus a continuance was inappropriate. The Court denied the request for a continuance as untimely.

C

The trial commenced, and the Government presented thirty-two witnesses, including Shah's patients and employees, the ECP bed supplier, insurers, his third-party billing service, and law enforcement officers. After the government rested, Shah moved for judgment of acquittal on Count Two, which the District Court denied. The jury found Shah guilty on both counts of health care fraud.

D

The District Court held a sentencing hearing to calculate the loss to insurers from Shah's conduct. FBI Special Agent Brooklynn Riordan testified that, for each insurer, she calculated (1) the average amount Shah billed and (2) the average amount the insurer reimbursed Shah, and identified, by dividing the average amount reimbursed by the average amount billed, a reimbursement rate. She then multiplied that rate by the total billing to that insurer, which, across all insurers, yielded a total loss of $5,919,100.00. The Government recommended reducing the total loss amount by 50%, which had the effect of treating half of Shah's billing for ECP treatment and companion codes as legitimate, even though there was no evidence that he ever legitimately used those codes. The District Court accepted the loss calculation over Shah's objection.

---

involvement in the government's prosecution of defendant," and declined to hold an evidentiary hearing. App. 50.

The Court sentenced Shah to concurrent terms of 78 months' imprisonment and three years' supervised release and ordered that he pay $1,234,983.60 in restitution. Shah appeals.

## II[3]

### A

We will address, in turn, Shah's challenges to the District Court's orders denying his motions to disqualify the entire USAO, for a continuance to conduct additional discovery, and for judgment of acquittal on Count Two.

### 1[4]

The District Court properly denied Shah's motion to disqualify the entire USAO. First, the District Court's decision was not arbitrary. We have recognized that "[a]s long as the court makes a 'reasoned determination on the basis of a fully prepared record,' its decision will not be deemed arbitrary." United States v. Stewart, 185 F.3d 112, 120 (3d Cir. 1999) (quoting United States v. Voigt, 89 F.3d 1050, 1075 (3d Cir. 1996)). Here, the District Court complied with its obligations, as it heard oral argument and received written submissions from both Shah and the Government on this issue and made its

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[4] "Our standard of review on an attorney disqualification issue includes both deferential and de novo elements. To the extent that the district court made factual findings, our review is for clear error . . . . [W]e exercise plenary review to determine whether the district court's disqualification was arbitrary in the sense that the court did not appropriately balance proper considerations of judicial administration against the United States' right to prosecute the matter through counsel of its choice . . . . If the disqualification was not arbitrary, we use an abuse of discretion standard . . . ." United States v. Whittaker, 268 F.3d 185, 193-94 (3d Cir. 2001).

decision based on a complete record, including declarations from Miller and the two AUSAs handling Shah's trial. Thus, we review the Court's ruling for abuse of discretion. See Whittaker, 268 F.3d at 194.

Second, the District Court did not abuse its discretion. Attorneys practicing before the United States District Court for the Western District of Pennsylvania must adhere to the Pennsylvania Supreme Court's Rules of Professional Conduct. See W.D. Pa. L. Civ. R. 83.3(A)(2); Pa. Const. art. V § 10. Under the Pennsylvania rules, a lawyer "currently serving as a public officer or employee . . . shall not . . . participate in any matter in which the lawyer participated personally and substantially while in private practice." 204 Pa. Code R. 1.11(d). While the lawyer who switches sides "is of course disqualified from participating in the case[,] . . . individual rather than vicarious disqualification is the general rule." Commonwealth v. Miller, 422 A.2d 525, 529 (Pa. Super. Ct. 1980) (quotation marks and citation omitted); see also 204 Pa. Code R. 1.11(d) cmt. (2) ("Because of the special problems raised by imputation [of a conflict of interest] within a government agency, [Rule 1.11(d)] does not impute the conflicts of a [government] lawyer to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers."). This is so because disqualifying an entire prosecutor's office, rather than just the conflicted attorney, would impose substantial costs on taxpayers because it would trigger the need to appoint special prosecutors each time a member of the defense bar switches sides. See, e.g., Miller, 422 A.2d at 529; Commonwealth v. Harris, 460 A.2d 747, 749 (Pa. 1983) (calling such an approach "simply not viable"). Furthermore, it would not address the true concern: to be sure that

7

"the acts of a public prosecutor have [not] actually tainted the proceedings." Harris, 460 A.2d at 749. Because actual taint must be shown, the mere "appearance of impropriety" is insufficient to support disqualification of an entire office.[5] See id.

To avoid taint, USAOs use methods to wall off the attorney from cases in which he played a role while in practice. Disqualification of an entire USAO is required only when screening devices, aimed at ensuring side-switching counsel is in no way involved in the case giving rise to the conflict, were not used or were ineffective. United States v. Goot, 894 F.2d 231, 234-35 (7th Cir. 1990); see United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981) (holding that because an attorney was separated from all participation on matters affecting his former client, "disqualification of an entire government department . . . would not be appropriate").

Here, the affidavits from Miller and the two AUSAs who tried Shah showed Miller was properly screened. Miller stated that she had "been recused and walled off from any involvement or oversight" in cases where she represented a defendant, including Shah's matter. App. 84. To implement the ethical screen, Miller told attorneys and supervisors assigned to cases from which she was recused that she could have no involvement in those cases. As to Shah specifically, Miller stated that she neither "participated . . . in the prosecution or supervision of this case" nor "divulged any

---

[5] Shah's reliance on People v. Shinkle, 415 N.E.2d 909 (N.Y. Ct. App. 1980), is misplaced. Shinkle disqualified the entire District Attorney's office because of "the unmistakable appearance of impropriety," id. at 920, a rationale that is not a basis for disqualifying government counsel under Pennsylvania's ethics rules, see Harris, 460 A.2d at 749; Miller, 422 A.2d at 529.

confidential information [she] learned" about Shah. App. 84-85. The trial AUSAs confirmed that Miller "has not participated in the [Shah] case in any manner" nor "divulged [to them] client confidences." App. 87, 90. Based on these sworn statements, the District Court did not clearly err in finding that Miller was screened from Shah's prosecution. Cf. Commonwealth v. Ford, 122 A.3d 414, 418 (Pa. Super. Ct. 2015) (remanding where trial court disqualified the entire district attorney's office because the record did not indicate whether confidential information was disclosed or a "sufficient fire wall ha[d] been . . . erected" and thus did not "support an exception to the general rule, i.e., [did not support] disqualification of the entire [District Attorney's] Office").

Moreover, Shah has not shown that the ethical screen was ineffective.[6] In fact, he concedes that he has no evidence that the denial of the disqualification motion prejudiced him in any way. See Caggiano, 660 F.2d at 191 (reversing order disqualifying entire USAO because, in part, "no prejudice has resulted to anyone in this case"). Instead, Shah simply suggests that Miller was inevitably involved in his prosecution because of her supervisory duties. In support, he cites the decision not to assign one of the trial AUSAs additional cases to allow her to work on Shah's case and the absence, in the AUSAs'

---

[6] Shah asserts that the ethical screen was ineffective because the trial AUSAs "found out" about Miller's recusal from the docket, Appellant's Br. at 16, but the attorneys' subjective understanding does not indicate that Miller did not satisfy her ethical obligations to notify attorneys in the office. In addition, United States v. Schell, 775 F.2d 559 (4th Cir. 1985), does not help Shah. Unlike this case, in Schell, there was some evidence suggesting that the side-switching AUSA disclosed his former client's confidences, and this led the court to question the effectiveness of the ethical screen there. Id. at 566. There is no indication here that Miller had any discussions about Shah with anyone.

9

affidavits, of information about who supervised them. Shah also relies on State v. Tippecanoe County Court, 432 N.E.2d 1377, 1379 (Ind. 1982), in which the Indiana Supreme Court concluded an entire district attorney's office was properly disqualified because the prosecutor had "administrative control over the entire staff." Here, however, there is no evidence that Miller exercised any control over the attorneys prosecuting Shah. To the contrary, she swore that she did not "participate[] or cooperate[] in the prosecution or supervision of [his] case," App. 84, was never the direct supervisor of the trial AUSAs, and would "not be involved in evaluating their performance in prosecuting the Shah matter," App. 85. Any decision Miller made regarding the AUSA's other cases has no bearing on Shah's prosecution. Furthermore, Shah points to no requirement that the USAO identify those who supervised the Shah prosecution in her stead, and he did not rebut her sworn statement that someone else handled the supervisory duties in Shah's case.

Thus, the District Court did not abuse its discretion in denying Shah's disqualification motion.[7]

2

The District Court also acted within its discretion in denying Shah's motion for a continuance on the first day of jury selection so that he could have an expert examine his

---

[7] The District Court also acted within its discretion in declining to hold an evidentiary hearing. While such a hearing may be useful in some cases, it is not required. Goot, 894 F.2d at 237. Here, the Court had affidavits from Miller and the trial AUSAs demonstrating an effective ethical screen was in place, and Shah presented nothing to show that Miller played any role in his case or disclosed any information she learned while representing him. See id.

10

patient files.  Denial of a continuance "constitutes an abuse of discretion only when it is 'so arbitrary as to violate due process.'"  United States v. Kikumura, 947 F.2d 72, 78 (3d Cir. 1991) (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)).

In this case, a continuance was not warranted.  First, Shah had access to the files since his 2016 indictment pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), and his prior counsel acknowledged receipt of a notice providing that he could inspect and copy all seized records.  Moreover, Shah does not dispute that his counsel received at least four letters in 2018 and 2019 reflecting that "[e]vidence gathered during the course of the searches . . . is available for your inspection, upon request," S. App. 101, and he concedes that he did not ask for access before trial.[8]  Second, Shah requested the continuance at the start of trial without providing any explanation for the late request and despite receiving other continuances.  Cf. United States v. Irizarry, 341 F.3d 273, 305-06 (3d Cir. 2003) (denying continuance for discovery requested two weeks before trial despite recent superseding indictment).  Therefore, the District Court did not abuse its discretion by denying the requested continuance.[9]

---

[8] To the extent Shah argues his counsel was ineffective in not requesting his patient files earlier, such a claim is generally not cognizable on direct appeal.  United States v. Givan, 320 F.3d 452, 464 (3d Cir. 2003).

[9] Moreover, Shah has not shown that he suffered any prejudice from the lack of further discovery.  Although he asserts that his patient files would reveal other symptoms that could support angina diagnoses, trial testimony showed that his files contained false information, he revised patient files before insurance reviews to "make them  . . . sound better," App. 327, and regularly recorded angina diagnoses regardless of whether the patient expressed chest pain—the defining characteristic of angina.

### 3[10]

The District Court properly denied Shah's motion for a judgment of acquittal on Count Two. Count Two charged Shah with health care fraud by knowingly billing insurers for ECP treatments using both the G0166 code and companion treatment codes already encompassed by G0166. To convict Shah of health care fraud, the Government was required to prove, among other things, that Shah acted with the intent to defraud the insurers who provided medical benefits. United States ex rel. Doe v. Heart Solution, P.C., 923 F.3d 308, 319 (3d Cir. 2019); 18 U.S.C. § 1347.

Viewing the record in the light most favorable to the Government, a reasonable jury could have found Shah acted with intent to defraud. First, the evidence showed that Shah knew that the G0166 code was not to be billed with codes for component treatments on the same day. Second, the evidence demonstrated that Shah disregarded the billing rules. Over his third-party billing service's objection, Shah directed the service to continue billing "[a]ll four codes." App. 836. Although Shah argues that he eventually stopped billing multiple codes—and told one insurer in 2011 that he instructed his billing department to bill only G0166—a reasonable jury could find that, by instructing the third-party billing service to continue billing using both code G0166 and the codes for the companion treatments despite being told he should not, Shah acted with intent to defraud

---

[10] We exercise plenary review over an order denying a motion for judgment of acquittal, United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002), and view the record "in the light most favorable to the prosecution," United States v. Garner, 961 F.3d 264, 274 (3d Cir.), cert. denied, 141 S. Ct. 932 (2020).

insurers.

Because a reasonable jury could have found Shah knew the billing requirements for ECP treatment and deliberately ignored them, the District Court properly denied his motion for judgment of acquittal on Count Two.

B[11]

Shah also argues that his sentence is both procedurally and substantively unreasonable.

1[12]

In reviewing the procedural reasonableness of a district court's sentence, we focus on, among other things, whether the district court correctly calculated the applicable Guidelines range. United States v. Merced, 603 F.3d 203, 215 (3d Cir. 2010). Shah disputes the District Court's loss calculation, which triggered a sixteen-level increase to his base offense level under U.S.S.G. § 2B1.1(b)(1)(I).

At the sentencing hearing, Special Agent Riordan testified that she examined insurers' data for claims involving ECP code G0166 together with the codes for the companion treatments on the same day. Riordan totaled the average amounts reimbursed

---

[11] "We review the factual determinations underlying a sentence for clear error." United States v. Douglas, 885 F.3d 145, 150 n.3 (3d Cir. 2018); see also United States v. Brennan, 326 F.3d 176, 194 (3d Cir. 2003) (reviewing loss calculation for clear error).

[12] A district court "need only make a reasonable estimate of the loss," based on available information in the record, United States v. Ali, 508 F.3d 136, 145 (3d Cir. 2007) (quoting U.S.S.G. § 2B1.1 cmt. 3(C)), and it "need not reach a precise figure," United States v. Tupone, 442 F.3d 145, 156 (3d Cir. 2006). "[T]he government bears the burden of establishing, by a preponderance of the evidence, the amount of loss." United States v. Fumo, 655 F.3d 288, 310 (3d Cir. 2011).

by each insurer and endorsed a 50% reduction of that amount. Given evidence suggesting that no ECP charges were legitimate,[13] Riordan testified that the 50% reduction yielded a "conservative" estimate. App. 1469-70. The resulting loss calculation was $2,959,550.00, with $1,296,502.00 coming from Medicare and Medicaid plans.

Shah's challenge to the loss calculation method fails. First, the average reimbursements were based on the insurance claims data, and not Shah's patient files as he contends. Relying on the claims data was appropriate here given the evidence that Shah's patient files contained false information. Second, witness testimony about Shah's billing practices support the "reasonable estimate" of loss from Shah's health care fraud scheme. United States v. Kolodesh, 787 F.3d 224, 239-40 (3d Cir. 2015). Shah instructed his third-party biller to continue billing "[a]ll four codes" despite insurers' warnings against such billing. App. 836. In addition, insurers notified Shah that he improperly submitted unbundled bills that were not substantiated by medical necessity. Third, treating 50% of Shah's ECP billing as legitimate is generous to Shah given the "extensive and pervasive" nature of his scheme. See United States v. Hebron, 684 F.3d 554, 563 (5th Cir. 2012). Fourth, and relatedly, estimation was the only means to calculate the loss. Shah's records contained fraudulent information. Thus, they did not

---

[13] Indeed, as the District Court observed in its discussion of the 50% reduction, "the vast majority of the submitted claims under consideration were fraudulent" because any of the following factors were present: (1) patient without a qualifying condition; (2) records were "fraudulently created . . . after-the-fact;" (3) ECP treatment was administered when a physician was not present; or (4) billing of unbundled codes without justification. App. 48-49.

14

provide a reliable basis to determine if any of the ECP treatments were medically necessary. See id. (affirming loss calculation because the defendant "should not reap the benefits of a lower sentence because of his ability to defraud the government to such an extent that an accurate loss calculation is not possible"); United States v. Miell, 661 F.3d 995, 1001 (8th Cir. 2011) (affirming loss calculation that subtracted average amount defendant returned—rather than actual amount, due to practicality of reviewing over 2,500 files—because proceeds "were systemically tainted with fraud" such that "it was difficult, if not impossible, to give [the defendant] any credit for parts of his claims that might have been legitimate").[14]

For these reasons, Shah's procedural challenge fails.

## 2

Shah's sentence was also substantively reasonable as we cannot say that "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." United States v. Tomko, 562 F.3d 558, 568 (3d Cir. 2009) (en banc). First, the sentence is within the applicable Guidelines range of 78 to 97 months, U.S.S.G. § 5A, so we may presume that it is reasonable, Rita v. United States, 551 U.S. 338, 347 (2007).

---

[14] Shah cites United States v. Jones, 641 F.3d 706 (6th Cir. 2011), but that case is distinguishable. Among other things, the Jones court called the extrapolation method used there "into question" because it appeared the district court "[did not] even realize[] that . . . fifty-four [of over 250] files were missing and . . . did not make a finding as to whether they were fraudulent." Jones, 641 F.3d at 712. Here, in contrast, the District Court found that because Shah would "fraudulently create [patient] files after-the-fact and solely for the benefit of receiving payment," records that could establish which treatments were fraudulent likely "did not exist." App. 47-48.

Second, considering the totality of the circumstances, <u>Tomko</u>, 562 F.3d at 567, Shah's sentence was not greater than necessary given the seriousness of his offense and the need for specific deterrence, 18 U.S.C. § 3553(a)(2)(A), (B). As to seriousness, Shah billed insurers for millions of dollars in ECP treatments where they were either not medically necessary for the patient or delivered without the required physician supervision or both.

As to the need for specific deterrence, Shah twice failed to appear for his court dates, leading the Court to issue arrest warrants. His failure to appear as required by court order was consistent with his flagrant disregard for his obligations to his patients to provide only medically necessary treatment and to follow the rules ensuring he was reimbursed for only such services. His conduct reflects that he did not believe the rules applied to him.

Because we cannot say that no reasonable sentencing court would have imposed the same sentence, Shah's substantive challenge fails.

### III

For the foregoing reasons, we will affirm.